969 F.2d 63
 Rodney D. GARDNER, Individually and as Custodian for the
children of Ruth M. Gardner, Deceased; RMG and Associates,
Incorporated, by Rodney D. Gardner, President; Vance D.
Israel; Denise Israel; Shirley Avin, Plaintiffs-Appellants,
v.
CITY OF BALTIMORE MAYOR AND CITY COUNCIL; Larry Reich,
Individually and as Director of Planning; Alfred E. Barry,
III, Individually and as Chief of Current Planning; Stanley
S. Fine, Individually and in his former official capacity as
a member of the Planning Commission of Baltimore City;
George G. Balog, Individually and as Director; Benjamin L.
Brown, Individually and as City Solicitor; Ambrose T.
Hartman, Individually and as Deputy City Solicitor; W.
Hayes Brown, III, Individually and as Assistant City
Solicitor; Mark A. Faber, Individually and as Solicitor;
Frank C. Derr, Individually and as Solicitor; Ortho M.
Thompson, Individually and as Solicitor, Defendants-Appellees,
and
Planning Commission of Baltimore City; Department of Law, Defendants.
 No. 91-1817.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 4, 1992.
Decided July 6, 1992.
 
 Edward Lee Blanton, Jr., Blanton & McCleary, Towson, Md., argued, for plaintiffs-appellants.
 Cyril Vincent Smith, Zuckerman, Spaeder, Goldstein, Taylor & Better, Baltimore, Md., argued (Herbert Better, on brief), for defendants-appellees.
 Before WILKINSON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and WILLIAMS, Senior District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case involves another local land-use dispute that has landed in federal court through 42 U.S.C. § 1983. The issue presented by this litigation is strikingly familiar: appellants claim that they were denied substantive due process by the failure of various Baltimore city officials to approve proposals for residential development of particular property. We reject this claim. Because Baltimore's land-use regulations granted discretion to city officials with regard to approval of the proposed development, appellants possessed no property interest protected by the Fourteenth Amendment. We therefore affirm the summary judgment for appellees.
 
 I.
 A.
 
 2
 As this case involves a challenge to the implementation of subdivision regulations governing development in the city of Baltimore, we shall briefly describe that regulatory process. Authority over subdivision regulation in Baltimore rests with the Planning Commission, see Charter of Baltimore City art. VII, § 78 (1964 revision), which is composed of nine members including the mayor and the director of public works, see id. § 65. The Commission has promulgated detailed regulations governing the development process. See Planning Comm'n, City of Baltimore, Rules and Regulations for Land Subdivision (1978) [hereinafter Subdivision Regulations].
 
 
 3
 Under the regulations, a developer must first submit a preapplication sketch plan and attend an informational pre-application conference with staff of the Planning Commission and the Site Plan Review Committee. See id. § 2.0-1. Based on these discussions, the developer then prepares a "preliminary plan," which is drawn to scale and indicates virtually all details of the proposed development. See id. § 2.0-2c. If satisfactory, the Commission tentatively approves the preliminary plan. See id. § 2.0-2b2.
 
 
 4
 After approval of the preliminary plan, the developer must submit two final plans, a "final subdivision plan" and a "final development plan." The final subdivision plan shows, inter alia, the relationship of the proposed subdivision to neighborhood facilities, the boundary lines of the property, all dimensions, and all lands to be dedicated to the city. See id. § 2.0-4a. The final development plan shows, inter alia, streets, lanes, alleys, rights-of-way, easements, sewers, dwelling units, building elevations, and lands to be dedicated to the city. See id. § 2.0-5a. Various city agencies review the final plans, see id. § 2.0-3b, and the Commission's approval, if forthcoming, is binding, see id. § 2.0-3a3. The Commission will not approve the final plans, however, unless all dedications of land to the city are deemed acceptable to the Commission. See id. § 2.0-6. Finally, once the final plans are approved by the Commission, the developer must receive the Board of Estimates' approval of a "public works agreement" for all streets and public utilities in the subdivision, which must be constructed by the developer. See id. § 3.0-3. Upon approval of the utility and street installations, the city then accepts the rights of-way and public works facilities for public ownership. See id. § 3.0-3.
 
 B.
 
 5
 The facts relevant to this appeal are not in dispute. In 1958, the Ludgate Building Corp. owned property known as "Fairway Hills, Section III," which is located in northwest Baltimore. Desiring to develop the property, Ludgate submitted to the city a "final subdivision plat" for its approval and recordation. The plat indicated that the subdivision would contain a horseshoe-shaped street, which both began and ended at Northcliff Drive. The city approved the subdivision plan in 1958 "as to [the] street and subdivision plan only as noted and subject to the requirements of the Department of Public Works and the Planning Commission," and the plat was recorded in the city's land records. After approval, Ludgate completed twelve of the twenty-two lots on the property, all on the northern side of the street known as Sareva Drive. The southern side, Ivydene Terrace, remained undeveloped and unsold until 1979, when appellant Rodney Gardner obtained an option to purchase the remaining ten lots for $50,000. He exercised that option and took title to the property in 1984 in the name of his assignee, appellant RMG and Associates, Inc.
 
 
 6
 Gardner sought to develop the Ivydene Terrace portion of the subdivision and, from 1979 to 1985, sought approval from the Planning Commission for various proposals regarding that development. Between 1979 and mid-1982, Gardner sought to alter the 1958 subdivision plan by ending Ivydene Terrace short of Northcliff Drive in a cul-de-sac. He devised the cul-de-sac plan because the steep slope of the property where Ivydene Terrace would intersect Northcliff Drive meant that extension of the road in accordance with the 1958 plan would be expensive. The cul-de-sac proposal ran into trouble almost immediately. The Department of Public Works (DPW) informed Gardner both in April 1980 and in May 1981 that, if he intended to deviate from the 1958 plan, he was required to submit new final plans for city review. The Commission also notified Gardner that property owners on Sareva Drive would have to consent to the cul-de-sac plan because they purchased their lots in reliance on the 1958 plan and therefore had a vested interest in the development of Ivydene Terrace in accordance with that plan. Gardner never submitted revised final subdivision or final development plans, but in June 1981 nevertheless demanded that DPW issue a public works agreement for the cul-de-sac plan. However, in September 1981 the city's Department of Law indicated to DPW that the size of the proposed cul-de-sac violated the subdivision regulations. Finally, the Sareva Drive residents not only did not consent to Gardner's cul-de-sac plan, but they also formed a committee to oppose any development of Ivydene Terrace.
 
 
 7
 Facing local opposition and the necessity of seeking approval of revised final plans, Gardner abandoned his cul-de-sac proposal in June 1982 and submitted a preliminary development plan that, consistent with the 1958 plan, extended Ivydene Terrace to Northcliff Drive. In response to this latest proposal, DPW requested a pre-approval determination as to whether the Ivydene Terrace road was publicly or privately owned. Although Gardner insisted that the road was owned by the city, city officials concluded that it was privately owned because the offer of dedication in 1958 was never accepted by the city. Moreover, in March 1983, the Department of Law, responding to an inquiry from the Commission, opined that the 1958 plan--upon which Gardner's then-current plans were based--was no longer valid because construction on the Ivydene Terrace portion of the subdivision had not begun within twenty-four months of the approval of the final plans. See Subdivision Regulations, supra, § 2.0-3a4. Thus, the Commission determined that Gardner was required to obtain approval of a new final development plan before he could be issued a public works agreement.
 
 
 8
 Gardner submitted such a plan in June 1983. In March 1984, however, the Planning Commission suggested an alternative: that the development of Ivydene Terrace consist of fewer lots (eight instead of ten) and that the street terminate in a cul-de-sac that was smaller than that Gardner had previously proposed. Although Gardner strongly resisted this suggestion--at one point he demanded that the mayor remove two members of the Commission for misconduct--he eventually relented and in March 1985 submitted a new final development plan that was consistent with the Commission's suggestion. That plan was approved with minor conditions, including the submission of a title report on the roadbed, in April 1985.
 
 
 9
 Objecting to the Planning Commission's imminent approval of development on Ivydene Terrace, several Sareva Drive residents in February 1985 filed a state action in the circuit court for Baltimore City seeking a declaration that Gardner's development plans were illegal. In October 1985, the circuit court held that the Commission had acted lawfully in its April 1985 approval of Gardner's latest final development plan, and it indicated that he could commence development provided that he "secure any permits required by law." Weinberger v. Gardner, No. 85-036-039/CE30445, slip op. at 2 (Baltimore City Cir. Ct. Oct. 16, 1985). The Commission still required Gardner to submit a title report on the disputed roadbed, however, which Gardner never did. In October 1987, the circuit court ordered him to obtain an acceptable title report, though in December it instructed the city to accept the offer of dedication of Ivydene Terrace and enter into a public works agreement with Gardner. Weinberger v. Gardner, No. 85-036-039/CE30445 (Baltimore City Cir. Ct. Dec. 3, 1987) (order). In March 1988, the city's Board of Estimates approved a public works agreement with Gardner. Before development began, however, Gardner lost title to the property in a foreclosure sale relating to his 1985 filing for bankruptcy protection.
 
 
 10
 In March 1988, Gardner and several purchasers of Ivydene Terrace lots brought suit in the federal district court for the District of Maryland. The complaint alleged that Baltimore City and various defendant city officials, under pressure from influential Sareva Drive residents, improperly prevented appellants from securing necessary approvals for residential development of the property. Gardner's claim was premised on the prolonged refusal of the city to issue him a public works agreement and the resulting damages sustained therefrom, and the claims of the lot purchasers rested on the failure of the city to issue building permits for construction on their lots, for which a valid public works agreement is a prerequisite. The action, based on 42 U.S.C. § 1983, alleged that defendants' actions violated procedural due process, substantive due process, and the equal protection clause and constituted a taking without just compensation. The district court granted the defendants' joint motion for summary judgment on all claims. Plaintiffs then appealed from the dismissal of their substantive due process claims.
 
 II.
 
 11
 Land use controls over subdivisions--the application of which give rise to Gardner's challenge--date from the late nineteenth century. The original statutes took the form of land platting legislation and were intended to provide a more efficient method of conveying property. See D. Hagman & J. Juergensmeyer, Urban Planning and Land Development Control Law § 7.2, at 191 (2d ed. 1986). Before subdivision control, land was sold by reference to metes and bounds, an unreliable system that often resulted in confusion and overlapping titles. See id. Subdivision regulations avoided these problems by requiring land developers to record in the local records office a "plat," or map, of the property. The plat, which contained precise dimensions, subdivided the land into blocks and lots and indicated the location of roads and parks. Once the plat was recorded, individual lots could then be conveyed by reference to the lot, block, and plat name, thereby avoiding the confusion inherent in the metes and bounds system. See id.
 
 
 12
 Beginning in the 1920s, subdivision control became not only a mechanism to simplify the conveyance of individual lots, but also a means through which localities could regulate urban and suburban development through comprehensive planning. See id. at 191-92. Localities began to use subdivision regulations to prevent the construction of new streets that were not well aligned with existing roads. See D. Mandelker, Land Use Law § 9.02, at 362 (2d ed. 1988). Subdivision control also functioned to ensure that development did not result in platted lots of unusable sizes that remained vacant, see D. Hagman & J. Juergensmeyer, supra, § 7.2, at 192, or in the splitting of large holdings suited for industrial or agricultural uses into numerous parcels that a private person could not reassemble, see Note, Land Subdivision Control, 65 Harv.L.Rev. 1226, 1226 (1952).
 
 
 13
 Following the second world war, localities used subdivision control to implement more extensive substantive regulation. With the expansion of suburban areas, subdivision regulation turned to ensuring the provision of adequate local governmental facilities and services. Thus, such regulation mandated the construction of parks and other recreational facilities as well as schools for area residents. See D. Hagman & J. Juergensmeyer, supra, § 7.2, at 193. Comprehensive planning also became concerned with structuring development to avoid serious off-site drainage problems and to avert the negative impact of development on the local environment. See id. Subdivision regulation also became a mechanism to ensure that streets were properly constructed and were sufficiently wide for anticipated traffic. See R. Platt, Land Use Control: Geography, Law, and Public Policy 222 (1991). Finally, localities required each lot to have adequate access to public services and utilities, such as water, sewage, gas, electricity, telephone, and cable television. See id. at 223.
 
 
 14
 The Baltimore Planning Commission's regulations on subdivision development reflect the full spectrum of these concerns. The city charter of Baltimore requires that those regulations ensure that developments include the following:
 
 
 15
 [A]dequate provision for all public improvements, enterprises and all public utilities, whether privately or publicly owned or operated; for the proper width, grade and arrangement of streets, and all uses of land for public transportation, and the relation thereof to existing streets; for adequate and convenient open spaces for traffic and the access of firefighting apparatus; [and] for proper drainage....
 
 
 16
 Charter of Baltimore City art. VII, § 78 (1964 revision).
 
 
 17
 As the breadth of the charter's purposes indicates, "[t]he regulation of land subdivision is ... a fundamental legal tool for municipal guidance of land development." R. Platt, supra, at 221. Indeed, land-use decisions are a core function of local government. Few other municipal functions have such an important and direct impact on the daily lives of those who live or work in a community. The formulation and application of land-use policies, therefore, frequently involve heated political battles, which typically pit local residents opposed to development against developers and local merchants supporting it. Further, community input is inescapably an integral element of this system. Subdivision control is an inherently discretionary system that allows--indeed, sanctions--compromise and negotiation between developers and the planners who represent the community. See D. Mandelker & R. Cunningham, Planning and Control of Land Development 799 (1979).
 
 
 18
 Resolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials is simply not the business of the federal courts. There is no sanction for casual federal intervention into what "has always been an intensely local area of the law." Rose, Planning and Dealing: Piecemeal Land Controls as a Problem of Local Legitimacy, 71 Calif.L.Rev. 839, 839 (1983). "Federal judges lack the knowledge of and sensitivity to local conditions necessary to a proper balancing of the complex factors" that are inherent in municipal land-use decisions. Sullivan v. Town of Salem, 805 F.2d 81, 82 (2d Cir.1986). Further, allowing "every allegedly arbitrary denial by a town or city of a local license or permit" to be challenged under § 1983 would "swell[ ] our already overburdened federal court system beyond capacity." Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 58 (2d Cir.1985). Accordingly, federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes. Section 1983 does not empower us to sit as a super-planning commission or a zoning board of appeals, and it does not constitutionalize every " 'run of the mill dispute between a developer and a town planning agency.' " Scott v. Greenville County, 716 F.2d 1409, 1419 (4th Cir.1983) (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir.1982)). In most instances, therefore, decisions regarding the application of subdivision regulations, zoning ordinances, and other local land-use controls properly rest with the community that is ultimately--and intimately--affected.
 
 III.
 
 19
 Appellants argue that the failure of city officials to issue a public works agreement to Gardner was arbitrary and capricious and, therefore, violated their right to substantive due process. The first step in analyzing whether the city deprived appellants of substantive due process is a determination of whether they possessed a property interest in the public works agreement that is cognizable under the Fourteenth Amendment's Due Process Clause. See Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir.1988); Scott, 716 F.2d at 1418. If there is no cognizable property interest, there is no need to reach the question of whether a purported deprivation was arbitrary or capricious. See id.
 
 
 20
 It is well-settled that the Fourteenth Amendment itself does not create property interests. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In the instant case, Gardner's interest in receiving a public works agreement--if he had any at all--is created and defined by the Baltimore city charter and the Planning Commission's subdivision regulations promulgated thereunder. The property interests created by state law have, however, been carefully circumscribed. As the Supreme Court has explained: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id.
 
 
 21
 Several circuits have applied Roth 's "claim of entitlement" standard to substantive due process challenges to municipal land-use decisions. Under this approach, whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency lacks all discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest. See Spence v. Zimmerman, 873 F.2d 256, 258 (11th Cir.1989); RRI Realty Corp. v. Incorporated Village of Southampton, 870 F.2d 911, 918 (2d Cir.1989); Carolan v. City of Kansas City, Mo., 813 F.2d 178, 181 (8th Cir.1987). See also Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Ks., 927 F.2d 1111, 1116 (10th Cir.1991) (adopting this standard in a case involving procedural due process). Under this standard, a cognizable property interest exists "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." RRI Realty, 870 F.2d at 918. Moreover, the standard focuses on the amount of discretion accorded the issuing agency by law, not on whether or to what degree that discretion is actually exercised. "Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." Id.
 
 
 22
 We believe that this standard appropriately balances the need for local autonomy in a matter of paramount local concern with recognition of constitutional protection at the very outer margins of municipal behavior. The standard represents a sensitive recognition that decisions on matters of local concern should ordinarily be made by those whom local residents select to represent them in municipal government--not by federal courts. It also recognizes that the Fourteenth Amendment's Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions. In our federal system, that is the province of the state courts. See Pearson v. City of Grand Blanc, 961 F.2d 1211, 1221-23 (6th Cir.1992) (distinguishing the role of federal courts in land-use cases from the more rigorous review undertaken in such cases by state courts); Shelton v. City of College Station, 780 F.2d 475, 482-83 (5th Cir.1986) (en banc) (same).
 
 
 23
 The standard that we apply here is also consistent with this circuit's prior land-use cases. In Scott v. Greenville County, 716 F.2d 1409 (4th Cir.1983), on which appellants rely, a developer claimed that the county's failure to issue him a building permit for construction of low-income housing violated due process. This court concluded that the developer had a cognizable property interest in the permit. Id. at 1418-19. This conclusion was based, however, on our determination that the county was required by state law to issue a building permit "upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance." Id. at 1418 (citing Niggel v. City of Columbia, 254 S.C. 19, 173 S.E.2d 136, 137-38 (1970), and Pure Oil Div. v. City of Columbia, 254 S.C. 28, 173 S.E.2d 140, 142 (1970)). In Scott, therefore, municipal authorities lacked all discretion to deny issuance of the permit and, as a result, the developer possessed a legitimate claim of entitlement under the standard we apply here. By contrast, in United Land Corp. v. Clarke, 613 F.2d 497 (4th Cir.1980), this court held that the failure of county authorities to issue a soil erosion permit did not deprive the developers of due process because those authorities had discretion under county law to refuse to issue the permit. Id. at 501. Because there was "no protectible property interest in the permit," id., local officials were not to be constrained in the formulation of land-use policy by a lawsuit under 42 U.S.C. § 1983.
 
 IV.
 
 24
 We now apply this standard to the case sub judice and conclude that state and municipal law accorded the city discretion to refuse to issue a public works agreement to Gardner. Accordingly, he had no legitimate claim of entitlement to the agreement and therefore did not possess a property interest within the cognizance of the Fourteenth Amendment.[1]
 
 
 25
 It is clear that, under Baltimore's subdivisions regulations, the Planning Commission's role is more than merely ministerial. In other words, the Commission has significant discretion to reject even properly submitted applications. For example, the Commission's approval of preliminary plans is tentative, and the Commission "reserves the right to examine the plans further and to make and enforce additional requirements when necessary and appropriate." See Subdivision Regulations, supra, § 2.0-2b2.
 
 
 26
 Likewise, the Commission retains significant discretion to reject submitted final plans. Although the regulations contain detailed requirements regarding what the final plans must show, see id. §§ 2.04a, 2.0-5a, they are silent as to the substantive criteria used by the Commission to evaluate the sufficiency of those plans. Instead, the regulations indicate that the final development plan is submitted to various city agencies, which "evaluat[e] the physical characteristics of the proposed subdivision" and submit recommended dispositions to the Commission. Id. § 2.0-3b; see also Baltimore City Dep't of Planning, Development Guidebook: Requirements for Building in Baltimore City 7 (3d ed. 1985) [hereinafter Development Guidebook ]. The Planning Commission solicits evaluations of the final development plan from the health department, the fire department, and various sections of the department of public works, including the highway design section, the sediment and erosion control section, the waste water division, the water supply division, and the street lighting-conduit section. See id. It is evident from the variety of agencies from which evaluations are sought that the Planning Commission may find a proposed subdivision inadequate on any number of grounds. Finally, the regulations also provide that final plans will not be approved by the Commission "until all dedications of land to the City have been deemed acceptable by the City." Subdivision Regulations, supra, § 2.0-6. This provision represents another significant grant of discretion to city authorities.
 
 
 27
 Appellants concede that significant discretion is generally vested in the Planning Commission. They contend, however, that all discretion evaporates after the Commission approves a final development plan and the plat is recorded in the city land records. Because a plat covering Ivydene Terrace was approved and recorded in 1958, appellants argue that the Commission's only function upon receiving Gardner's application was to ensure that his proposed construction conformed to the 1958 approved final plan and recorded plat. Thus, according to appellants, the city had no discretion not to issue a public works agreement and they therefore have a legitimate claim of entitlement to it.
 
 
 28
 In reviewing these arguments, we take notice of the lengthy period between the 1958 approval of the plan and the submission of Gardner's proposals. We are skeptical that Commission approval of the final plan survived the twenty-five year period of dormancy given the significant changes in the urban scene and environment that occurred during that period. As the district court noted, the intervening years witnessed "nearby development, changes in streets, and the enactment of updated regulations and requirements governing developing property." We view appellants' contention that the Planning Commission lacked discretion against this backdrop, and we find that contention to be without merit.
 
 
 29
 To begin with, four of Gardner's five proposals differed in significant respects from the final development plan approved by the Commission in 1958. The first proposal terminated Ivydene Terrace in a cul-de-sac instead of continuing it to Northcliff Drive; the third and fifth also contained a cul-de-sac and altered some lot lines; and the grade on the road was unacceptably high on the second. The subdivision regulations require a developer who wants to revise an approved final subdivision or development plan to submit a new final plan to the Commission for its "consideration and approval." See id. § 2.0-9. The Commission, therefore, had full discretion to refuse to issue a public works agreement for those proposals that differed from the 1958 plan.
 
 
 30
 Appellants are thus left to rely on Gardner's fourth proposal, the only one that was similar to the 1958 plan. Even with regard to this proposal, however, the city was not obligated to issue Gardner a public works agreement. Not only did Gardner elect to submit his fourth proposal to the Planning Commission's discretion by filing a final development plan with the Commission in June 1983, but he also abandoned that proposal in favor of his fifth and final one. In light of Gardner's actions, appellants cannot claim that Baltimore law creates a legitimate claim of entitlement.
 
 
 31
 Even were we to overlook the flaws in Gardner's proposals, by the plain terms of the subdivision regulations the 1958 approval is no longer outstanding vis-a-vis the unbuilt portion of the original subdivision. Although the 1978 version of the subdivision regulations indicates that they are inapplicable to final plans "approved and recorded" prior to the effective date of the regulations (March 15, 1978), the 1978 regulations do apply when Commission approval expires under the terms of § 2.0-3a4. See id. § 1.0-5. Section 2.0-3a4 provides:
 
 
 32
 Approval of the Final Development Plan shall automatically expire twenty-four months from the stamped date of approval if evidence of effectuation of the Plan is not determined by the Planning Commission within the same period of time; except that approval may be extended after twentyfour months for a like period at the request of the developer, and with the concurrence of the Planning Commission.
 
 
 33
 It is undisputed that there was no request for an extension and that construction on Ivydene Terrace did not begin within twenty-four months. Appellants argue, however, that § 2.0-3a4 is inapplicable because construction began within twenty-four months on the Sareva Drive portion of the subdivision. This construction is sufficient to avoid expiration under § 2.0-3a4, they contend, because approval of a subdivision cannot subsist in part and expire in part. We disagree. Under longstanding Maryland law, a municipality may approve only part of a developer's subdivision. See Kennedy v. Mayor of Cumberland, 65 Md. 514, 9 A. 234, 236 (1886) (holding that a city may partially accept a developer's dedication of streets to the city).[2] We conclude, therefore, that the 1958 approval no longer applies to the lots on Ivydene Terrace.
 
 
 34
 We also reject appellants' suggestion that they were deprived of due process because the Planning Commission acted at the behest of politically influential residents of Sareva Drive who opposed any development of Ivydene Terrace. Because appellants possessed no cognizable property interest, appellees' actions do not constitute a constitutional violation even if their decisions were motivated solely by political considerations. As the Second Circuit has noted, "the plaintiff may be deemed not to have a protected property interest in the requested permit, even in a case where the denial of the permit is arbitrary. The fact that the permit could have been denied on nonarbitrary grounds defeats the federal due process claim." RRI Realty, 870 F.2d at 918 (emphasis in the original).[3] Moreover, we find nothing pernicious in the actions of the Sareva Drive residents in opposing Gardner's proposals. These residents were motivated to oppose Gardner's development by, among other things, the prospect of increased traffic congestion on the streets near their homes. Those who live near proposed development have the most significant personal stake in the outcome of land-use decisions and are entitled, under our system of government, to organize and exert whatever political influence they might have. Nor is it necessarily improper for municipal government to consider or act upon such political pressure. Such give-and-take between government officials and an engaged citizenry is what democracy is about.
 
 V.
 
 35
 Baltimore's subdivision regulations vest broad discretion with the Planning Commission at virtually every stage of the process. This fact by itself deprives appellants of any legitimate claim of entitlement to the regulatory approvals they sought. Because they did not possess any property interest cognizable by the Fourteenth Amendment's Due Process Clause, their § 1983 action was properly dismissed. The judgment of the district court is therefore
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 Because a public works agreement is a prerequisite to the issuance of buildings permits, see Baltimore City Dep't of Planning, Development Guidebook: Requirements for Building in Baltimore City 4 (3d ed. 1985), the other appellants' claims of entitlement to such permits are a fortiori without merit
 Since we conclude that appellants possessed no cognizable property interest, we need not address the city's argument that state law provides adequate post-deprivation remedies and that appellants' § 1983 claims are therefore barred under Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).
 
 
 [2]
 Appellants' attempts to distinguish Kennedy are unavailing. The cases upon which they rely based their decisions on municipal statutes expressly accepting a developer's dedication to the city upon recordation of a subdivision plat. See Mayor & Council of Rockville v. Geeraert, 261 Md. 709, 276 A.2d 642, 645 (1971); Maryland-Nat'l Capital Park & Planning Comm'n v. McCaw, 246 Md. 662, 229 A.2d 584, 586, 589-90 (1967); Small v. State Roads Comm'n, 246 Md. 646, 229 A.2d 408, 410 (1967); Whittington v. Good Shepherd Evangelical Lutheran Church, 236 Md. 185, 202 A.2d 751, 754-55 (1964). These cases held that such statutes bound the municipalities and created vested rights. Here, by contrast, there is no such statute that accepted the dedication of Ivydene Terrace. Appellants' reliance on Baltimore, Md., Code art. 26, § 93 is misplaced, because § 93 by its terms accepts only those dedications offered prior to enactment of the provision, which occurred for the final time in 1922. See Baltimore, Md., Ordinance 753 (Oct. 20, 1922)
 Moreover, the city charter expressly indicates that mere approval of the final plans does not constitute acceptance of the developer's dedication of the streets. Upon approval of a final subdivision plan, all streets indicated in the plan have the status of streets on the city's official detailed plan. See Charter of Baltimore City art. VII, § 81 (1964 revision). Nonetheless, the charter indicates that "[t]he adoption of an Official Detailed Plan shall not ... be deemed the opening or establishment of any street, or the taking of any land for public purposes, but solely as a designation of the location shown thereon for future acquisition for public use...." Id. art. VII, § 76.
 
 
 [3]
 For the same reason, that a state court eventually ruled in Gardner's favor and ordered the city to issue a public works agreement is beside the point. The review undertaken by state courts for arbitrariness and capriciousness in land-use cases is of an entirely different order than that undertaken by federal courts in reviewing state and municipal decisions under the Due Process Clause. See Pearson, 961 F.2d at 1221; Shelton, 780 F.2d at 482-83