**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEAKHOUSE, INCORPORATED, a
Florida corporation; INVESTMENT
PARTNERS, INCORPORATED, a Florida
corporation,
<u>Plaintiffs-Appellants,</u>

v.                                                                          No. 97-2341

THE CITY OF RALEIGH, NORTH
CAROLINA, a North Carolina
municipal corporation; RALEIGH
BOARD OF ADJUSTMENT,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-97-177-5-BO)

Argued: September 23, 1998

Decided: January 21, 1999

Before WILKINSON, Chief Judge, and HAMILTON and MOTZ,
Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Hamilton and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** David Alan Wasserman, Winter Park, Florida, for Appel-
lants. Dorothy K. Woodward, Associate City Attorney, CITY OF

RALEIGH, Raleigh, North Carolina; John M. Silverstein, SATISKY & SILVERSTEIN, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Thomas Franklin Loflin, III, LOFLIN & LOFLIN, Durham, North Carolina, for Appellants. Thomas A. McCormick, City Attorney, CITY OF RALEIGH, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

Steakhouse, Incorporated seeks to construct a topless dancing bar in Raleigh, North Carolina. It challenges the City's special use permit procedure for adult establishments. Steakhouse brought suit in federal district court claiming that the permit procedure is an unconstitutional prior restraint. It moved for a preliminary injunction mandating the issuance of a special use permit for its proposed bar. The district court denied the motion, and Steakhouse appeals. Because the likelihood that Steakhouse will ultimately succeed on the merits of its claim is slight, we are unable to conclude that the district court abused its discretion in denying preliminary injunctive relief. Accordingly, we affirm the judgment.

I.

Steakhouse wishes to join the eleven adult establishments currently operating in Raleigh, North Carolina, by opening a topless bar. To build in Raleigh, a developer must obtain city approval for its site plan. Site plan review involves only the generic plan for a proposed building and is conducted by the Planning Department, the Planning Commission, the City Council, or some combination of the three. Certain types of uses, including topless bars, require a special use permit in addition to site plan approval. Raleigh, N.C., Code § 10-2144. Special use permit review is conducted by the Raleigh Board of Adjustment (BOA). The BOA is a separate entity from the City. It is an independent, quasi-judicial body operating under specific state statutory authority. N.C. Gen. Stat. § 160A-388.

To receive a special use permit, a topless bar must satisfy specific parking, advertising, concentration, and distance requirements.

2

Raleigh, N.C., Code § 10-2144(b)(1)-(4). Similarly, the prospective owners of such a bar must demonstrate that it will not adversely affect public services and facilities such as parking, traffic, and police. Id. § 10-2144(b)(6). In addition, they must show that the bar's "secondary effects," such as noise, light, stormwater runoff, parking, and pedestrian circulation will not adversely affect adjacent properties. Id. If the BOA decides to grant a permit, it may append up to thirteen enumerated conditions to that grant. Id.§ 10-2141(c). The BOA is not, however, limited to those thirteen conditions and may attach others as is appropriate. Id. Judicial review of all BOA determinations is "in the nature of certiorari." N.C. Gen. Stat.§ 160A-388(e).

After locating a site for its bar, Steakhouse filed a site plan application with the City of Raleigh's Planning Department on November 4, 1996. The application stated that Steakhouse wished to construct a restaurant and lounge. On November 13, 1996, it filed an application for a special use permit to operate an "adult establishment" on the same site.**1** The Planning Commission recommended approval of Steakhouse's site plan to the City Council. Upon learning of the intended adult use for the site, however, the City Council tabled Steakhouse's application pending the BOA's special use permit decision. The BOA held a hearing on January 13, 1997, at which it denied Steakhouse's application for a special use permit on the grounds that Steakhouse's proposal provided for an insufficient number of parking spaces and failed to demonstrate that Steakhouse's bar would not adversely affect public services or adjacent properties.

Rather than petition for certiorari, Steakhouse brought suit in the United States District Court for the Eastern District of North Carolina. It then filed a motion for a preliminary injunction seeking a special use permit. The district court denied that motion, and Steakhouse now appeals.**2**

_____

**1** The City defines adult establishment to include adult bookstores, adult motion picture theaters, adult mini motion picture theaters, and any establishment featuring topless dancers, go-go dancers, strippers, male or female impersonators, or similar entertainers. See Raleigh, N.C., Code § 10-2002; N.C. Gen. Stat. § 14-202.10(2).
**2** When Steakhouse originally filed suit, the BOA was operating under a now superseded set of procedural rules for special use permits. During

II.

In deciding whether to grant a preliminary injunction, the district court is to consider three factors. First, it must balance the likelihood of irreparable harm to the plaintiff if the injunction is refused against the likelihood of irreparable harm to the defendant if it is granted. Second, the court should consider the likelihood that the plaintiff will succeed on the merits. The more the balance of harms leans away from the plaintiff, the stronger his showing on the merits must be. Finally, the court must consider the public interest. Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977). When reviewing a denial of a preliminary injunction, this court applies an abuse of discretion standard. Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 814 (4th Cir. 1991). "[T]he grant of interim relief [is] an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in[the] limited circumstances which clearly demand it." Id. at 811 (internal quotation marks omitted).

A.

Steakhouse argues that the balance of harms militates in favor of a preliminary injunction. Specifically, Steakhouse claims that the First Amendment protection due topless bars is so significant that any

_____

the pendency of this action the BOA amended its rules to require that it make a determination within 90 days of receiving an application and to facilitate prompt judicial review of the BOA's decisions. The City argues that these rule changes render Steakhouse's claim moot.

We cannot agree. The new rules adopted in large part the BOA's prior practice. Steakhouse challenges these new rules every bit as vigorously as it did the prior practice. Indeed, Steakhouse has insisted that the 90-day period for administrative action is impermissibly long and that the rules continue to unconstitutionally require it to prove that it will not create negative secondary effects. Moreover, Steakhouse maintains its objections to the rest of Raleigh's special use permit procedure. It attacks the procedure for failing to cabin the substantive aspects of the BOA's decisionmaking process and for failing to provide prompt judicial review on the merits of the BOA's decisions. When a live controversy remains on appeal, as it does in this case, we are obliged to hear it.

4

infringement tips the harms balance in its favor, trumping any harm the City might suffer were we to grant the injunction. Steakhouse claims that "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury" justifying the grant of a preliminary injunction. Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion).

Assuming arguendo that topless dancing is entitled to the full measure of First Amendment protection, but see Barnes v. Glen Theatre, Inc., 501 U.S. 560, 581 (1991) (Souter, J., concurring in the judgment), the expression inherent in topless dancing is different from pure speech because it comes bundled in conduct. Expressive conduct enjoys less protection than does pure speech and restrictions on its exercise are more likely to be constitutionally permissible. See, e.g., United States v. O'Brien, 391 U.S. 367, 376 (1968). This is so because restrictions on expressive conduct typically act not on the communicative component, but on the noncommunicative aspects of the conduct. These restrictions often seek to dampen the noncommunicative secondary effects of that conduct rather than the expression itself. See Barnes, 501 U.S. at 582 (Souter, J., concurring in the judgment).

In fact, nude and topless barroom dancing have a long history of spawning deleterious effects. They encourage prostitution and the criminal abuse and exploitation of young women. See California v. LaRue, 409 U.S. 109, 111 (1972) (noting that "[p]rostitution occurred in and around [topless bars], and involved some of the female dancers" and that "[i]ndecent exposure to young girls, attempted rape, [and] rape itself" also were quite common around such establishments). Indeed, Steakhouse's own Florida operations have long histories of secondary blight. One club was the location of 261 calls to the police between January 1995 and December 1996. Another was the site of 150 such calls over the same period. The disturbances that prompted the calls involved not simply lascivious conduct but drunken driving, larcenies, assaults, and narcotics use. The First Amendment does not foreclose communities from taking modest precautions against the secondary maladies of nude or topless barroom dancing.

Even apart from the nature of the right, Steakhouse's casual pursuit of its permit gives its cries of irreparable injury a tinny pitch. Steak-

5

house delayed the permitting process on two separate occasions. First, Steakhouse filed its applications for site plan approval and for a special use permit on November 4 and November 13, 1996, respectively. This meant that the BOA would have heard its special permit request on December 9, 1996, roughly one month before the Planning Commission considered its site plan. Steakhouse, however, requested that the BOA delay its review until January 13, 1997. Second, on February 3, 1997, Steakhouse's counsel heard the BOA's Sessions Reporter, Donna Hester, dictating the record from the January 13 meeting -- a prerequisite to any judicial appeal of the BOA's permit decision. Rather than requesting an expedited effort, or even ensuring that the process was proceeding along its normal schedule, counsel told Hester "there was no rush" and instructed her to take her time. It seems curious to hear Steakhouse now complain about the loss of its asserted rights for "even [a] minimal period[ ] of time." Elrod, 427 U.S. at 373 (plurality opinion).

On the other side of the equation, we are not free to ignore the harms to the City were we to grant a preliminary injunction. As noted above, topless dancing establishments can create negative side effects. These establishments may cause injury to the citizens of a city and damage to their property. They also cause many lesser effects -- for example, here the BOA found that Steakhouse's proposed bar provided an insufficient number of parking spaces and would create hazardous conditions for pedestrian and automotive traffic in the area. All of these effects tend to lower surrounding property values. Moreover, localities experience real harms when federal courts become unnecessarily involved in local land-use decisions-- decisions that often require specific knowledge of local conditions.

Finally, were we to grant the preliminary injunction we would risk vesting in Steakhouse a right under North Carolina law to construct its proposed establishment, irrespective of whether a court later found that permanent injunctive relief was inappropriate. Section 160A-385.1 grants a landowner a right to "undertake and complete the development and use of property," N.C. Gen. Stat.§ 160A-385.1(b)(6), once a city has approved a "site specific development plan." Id. § 160A-385.1(a). Such approval includes the granting of a special use permit such as the one at issue. Id. § 160A-385.1(b)(5). Although no North Carolina court has directly addressed the applica-

6

tion of this provision to the granting of a preliminary injunction, we cannot say with any certainty that none would find section 160A-385.1 applicable.

In sum, Steakhouse has failed to demonstrate that it would suffer irreparable harm without a preliminary injunction, and a fortiori, that any harm that it might suffer decidedly outweighs that which would befall the City of Raleigh were this court to grant the injunction. Without this showing, Steakhouse must present strong evidence that it is likely to succeed on the merits of its constitutional claim.

B.

Steakhouse maintains that it is likely to succeed on the merits of its claim because Raleigh's special use permit scheme is an unconstitutional prior restraint. As we noted in 11126 Baltimore Boulevard v. Prince George's County, Md., an ordinance acts as such a restraint when "it prohibits [adult establishments] from operating anywhere within the [City] until permission in the form of a special exception has been granted." 58 F.3d 988, 995 (4th Cir. 1995) (en banc). Consequently, Raleigh's scheme must sufficiently cabin the decision-maker's discretion, provide for a prompt administrative determination, and provide for prompt judicial review. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 226-27 (1990). We remain cognizant, however, that "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 557 (1975). With that admonition in mind, we address Steakhouse's claims seriatim.

1.

Steakhouse maintains that sections 10-2144(b)(6) and 10-2141(c) of the Raleigh code are unconstitutional because they fail to cabin the BOA's discretion sufficiently as it passes upon special use permit applications. Section 10-2144(b)(6) provides that an applicant must demonstrate that its use will not adversely affect public services such as parking, traffic, and police or adversely affect adjacent properties with respect to such things as parking, pedestrian circulation, and safety. Raleigh, N.C., Code § 10-2144(b)(6). Section 10-2141(c) pro-

7

vides that the BOA may append any one or a combination of thirteen factors to its grant of a special use permit. Id. § 10-2141(c). The BOA, however, is not limited to these conditions and may include others. Id.

First, Steakhouse complains that section 10-2144(b)(6) duplicates the parking and safety concerns the Planning Commission must already take into account when it reviews a site plan, and thereby serves as a ruse to protect the BOA's unfettered discretion. It is not true, however, that section 10-2144(b)(6)'s parking and safety considerations are duplicative with respect to topless dancing establishments. The parking and safety standards that the Planning Commission applies to site plan review come from estimates of the normal impact a commercial establishment will have on a surrounding area. Raleigh certainly is allowed to recognize that some establishments may not fit that generic commercial profile and to provide for more stringent requirements to address their special characteristics. Traffic and safety concerns as well as parking requirements may increase when an establishment offers adult entertainment. Indeed, another topless dancing club in Raleigh provides for three times the number of parking spaces that Steakhouse proposed in its site plan despite the fact that the establishments would be roughly the same size. We cannot find that section 10-2144(b)(6)'s parking and safety requirements are duplicative -- topless dancing bars and ordinary commercial establishments themselves may simply be different.

Second, Steakhouse argues that section 10-2144(b)(6) provides no express criteria for determining whether a proposed use will adversely affect public services such as police protection or create secondary effects such as parking overflow. Steakhouse claims that the Supreme Court struck down a similar provision in Shuttlesworth v. City of Birmingham, 394 U.S. 147 (1969). The Court in Shuttlesworth, however, faced a much more broadly worded provision than the one at issue. There, a Birmingham ordinance required a permit for any parade or public demonstration. It provided that such permit should issue unless the City Commission "in its judgment[determined that] the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." Id. at 149-50. In place of these boundless terms, section 10-2144(b)(6) specifically requires the BOA to consider a topless bar's effect on parking, traffic, police pro-

8

tection, noise, light, stormwater runoff, pedestrian circulation, and safety. Rather than allowing the decisionmaking body to manipulate such malleable concepts as local welfare, decency, and good order, section 10-2144(b)(6) channels the BOA's discretion, forcing it to focus on concrete topics that generate palpable effects on the surrounding neighborhood.

Finally, Steakhouse maintains that section 10-2141(c) provides the BOA with unfettered discretion because it leaves open the list of conditions the BOA may attach to its grant of a permit. However, the enumeration of thirteen specific conditions leaves the ordinance less open-ended than Steakhouse would have us believe. Moreover, the thirteen conditions do not relate in any way to expressive speech. Rather, they address the well-known variables inherent in any development (e.g., appearance of the proposed building, dedication of street and utility rights of way to the public, drainage systems, signage, etc.) that local governments have long been permitted to consider as a matter of their traditional land-use authority.

2.

Steakhouse also claims that Raleigh's special use permit review procedure lacks the requisite procedural safeguards. First, Steakhouse argues that the BOA's rules do not provide a reasonably short time frame within which the BOA must make its determination.

We believe, however, that the BOA's rules do provide a reasonable time frame for an administrative decision. In determining the reasonableness of the time period, this court must consider the type of judgments the BOA must make, the process in which it must engage, and the hardship placed on topless bars as a result of the restraint. See 11126 Baltimore Blvd., 58 F.3d at 997. The BOA's rules provide that "the Board shall mail to or personally serve the applicant with the final decision of the Board as entered in the Board's minutes no later than ninety (90) days after the applicant files a completed application with the Sessions Reporter for the Board." Board of Adjustment, Raleigh, N.C., Rules § V(D)(1) (1997).

There is nothing unconstitutional about the BOA's ninety-day rule, given the nature of the decision and the tasks that must be performed

prior to and after the BOA's meeting. See, e.g. , 11126 Baltimore Blvd., 58 F.3d at 998 (citing with approval Wolff v. City of Monticello, 803 F. Supp. 1568, 1574 (D. Minn. 1992) (noting that 90-day time period is not per se unreasonable)). Determining whether a topless bar strains public services and imposes adverse secondary effects on neighboring landowners requires the BOA to analyze several complex considerations. Moreover, the procedures involved in coming to a decision require some time. Prior to the meeting, the Sessions Reporter must notify all adjacent landowners of the permit request, place a sign on the property giving notice of the meeting, publish an advertisement for the meeting, and prepare materials for the BOA's members. After the meeting, the Sessions Reporter must transcribe the meeting, and the BOA's attorney must prepare preliminary findings of fact and conclusions of law. Then the BOA must make a final determination. The City represents that to compress this schedule further would result in hasty decisionmaking, harming not only the City but the applicant. We agree and, as a result, cannot find that ninety days is constitutionally impermissible.

It is instructive to note the promptness with which the BOA acted on Steakhouse's application. Steakhouse filed its application on November 13. By January 13, two months later, Steakhouse knew its answer. And, pursuant to BOA policy, it would have received the final written decision within one more month had Steakhouse's own counsel not informed the BOA's Sessions Reporter there was no need to hurry. Steakhouse simply cannot complain about the speed with which the BOA acted.

Second, Steakhouse complains that sections 10-2144(b)(6) and 10-2141(a)(7) of the Raleigh code unconstitutionally place the burden of proving no adverse secondary effects on the applicant during the administrative process.**3** Steakhouse relies for this proposition on Freedman v. Maryland, where the Supreme Court required film censors, rather than film distributors, to petition the judiciary to enforce any decision to deny a license to a film distributor and, once in court,

_____

**3** Section 10-2144(b)(6) provides the list of adverse effects which the BOA must find the proposed use not to generate. Raleigh, N.C., Code § 10-2144(b)(6). Section 10-2141(a)(7) places the burden of proving no adverse effects on the applicant. Id. § 10-2141(a)(7).

to bear the burden of proof that the license should be denied. 380 U.S. 51 (1965). <u>Freedman</u> is distinguishable here on two grounds. Initially, <u>Freedman</u> addressed judicial review, not the administrative process. In addition, the one time the Supreme Court considered whether to extend this part of <u>Freedman</u> from film censorship attempts to adult establishment licensing schemes, it split on the question. <u>FW/PBS</u>, 493 U.S. 215.**4** We now decline, as did Justices O'Connor, Stevens, and Kennedy, to extend this part of <u>Freedman</u> to the process by which Raleigh licenses topless bars, especially the administrative portion of that process. In <u>Freedman</u>, the Court understandably imposed significant burdens on film censors because "it may prove too burdensome [for film distributors] to seek review of the[administrative] determination" through "a protracted and onerous course of litigation." <u>Freedman</u>, 380 U.S. at 59. Given the promptness with which the BOA must pass on applications, we have no reason to believe that these establishments will be dissuaded from applying for special use permits merely because they bear the burden of persuasion as to secondary effects. Moreover, we note, as did Justice O'Connor, that permitting schemes like Raleigh's do not directly regulate content. <u>See FW/PBS</u>, 493 U.S. at 229. They are a far cry from the censorship scheme present in <u>Freedman</u>.

3.

Finally, Steakhouse argues that BOA's rules and section 160A-388(e) together fail to provide special use permit applicants with prompt judicial review on the merits. Section 160A-388(e) provides

_____

**4** In passing on the constitutionality of a Dallas adult establishment licensing scheme, Justice O'Connor, joined by Justices Stevens and Kennedy, argued that the <u>Freedman</u> factor should not apply. <u>FW/PBS</u>, 493 U.S. at 228-30 (plurality opinion). Justice Brennan, joined by Justices Marshall and Blackmun, suggested that it should. <u>Id.</u> at 238-42 (Brennan, J., concurring in the judgment). Justice White, joined by Chief Justice Rehnquist, argued that prior restraint analysis did not apply to such a content-neutral licensing scheme. <u>Id.</u> at 244-49 (White, J., concurring in part and dissenting in part). Justice Scalia dissented on other grounds. <u>Id.</u> at 250-64 (Scalia, J., concurring in part and dissenting in part). The result is that the applicability of the <u>Freedman</u>"burden" rule to an ordinance such as this one is unresolved.

that a final decision by the BOA may be appealed within thirty days through a petition "in the nature of certiorari" to state superior court. N.C. Gen. Stat. § 160A-388(e). Steakhouse maintains that certiorari review is insufficient because a court need not grant it, and even if it does, it need not make a decision within a definite time period.

As noted, the Supreme Court requires that we analyze Raleigh's procedure with the knowledge that "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." Southeastern Promotions, 420 U.S. at 557. This is why, in 11126 Baltimore Boulevard, we recognized that the constitutional requirements "may vary in different contexts." 58 F.3d at 997 (internal quotation marks omitted). It is clear, for example, that many forms of expression -- films, parades, demonstrations, leaflets, all forms of printed matter and spoken messages -- tend to be time sensitive. Even a short restriction may sacrifice the saliency of their message. In Freedman, for instance, the Court was concerned that Maryland's film censorship procedure would greatly harm film distributors because of the small window of opportunity they enjoyed in which to show a film. 380 U.S. at 61. The Court worried that by the time the distributor navigated the administrative and judicial review processes, it would "find the most propitious opportunity for exhibition past." Id. Topless dancing does not go similarly stale -- it tends not to be keyed to external events, and the strength of whatever message it conveys remains more or less constant over time.

Viewed in this manner, Raleigh's procedure provides for sufficient judicial review of a topless bar's application for a special use permit. Initially, it is instructive that the BOA has done what it reasonably could to speed review of its decisions. See 11126 Baltimore Blvd., 58 F.3d at 1001 n.18. Unless good cause exists to oppose a writ of certiorari, the BOA will stipulate to the writ within five days of a request for stipulation. It will transmit the record to the court no later than five days after it has received notice of a grant of the writ. Finally, it will submit its brief within fifteen days of having received the petitioner's brief. To the extent that it is within its power, the BOA has ensured prompt judicial review.

12

Further, section 160A-388(e) ensures prompt judicial review on the merits of a topless bar's application. It provides that a petitioner must file its writ within thirty days of the BOA's determination. North Carolina's common law writ is a "simple and expeditious" way to obtain judicial review. Little v. City of Locust, 349 S.E.2d 627, 629-30 (N.C. App. 1986). In deciding whether to grant a writ, the superior court must find: 1) that no appeal is provided by law; 2) a prima facie case of error below; and 3) merit to the petition. North Carolina Cent. Univ. v. Taylor, 471 S.E.2d 115, 118 (N.C. App. 1996), aff'd, 481 S.E.2d 83 (N.C. 1997). Consequently, even when the superior court denies the writ, it appears to consider the merits. The respect that comity requires we accord state courts invokes a presumption that the superior court would provide Steakhouse expeditious review.[5]

C.

Finally, Steakhouse maintains that the public interest would be served if it obtained a preliminary injunction. Steakhouse simply states that it is in the public interest to enjoin an unconstitutional statute. That is true. But Raleigh's special use permit process is not unconstitutional as it pertains to topless dancing bars. The process serves simply to protect Raleigh's citizenry from the negative secondary effects associated with such establishments. In addition, granting Steakhouse's request for a preliminary injunction would appear to contravene the general rule that land-use disputes affecting local communities must not lightly be removed from them. Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 828-29 (4th Cir. 1995); Gardner v. City of Baltimore Mayor, 969 F.2d 63, 67-68 (4th Cir. 1992). For these reasons, granting a preliminary injunction would not be in the public interest.

_____

[5] Here, however, we cannot know how a North Carolina superior court would respond were Steakhouse to petition for a writ because Steakhouse never did so. Instead, immediately upon the BOA's unfavorable permit decision, Steakhouse ignored the state judicial system entirely and filed suit in federal district court. Notwithstanding this failure, we have nonetheless entertained Steakhouse's challenge to Raleigh's procedure as we believe 11126 Baltimore Boulevard, 58 F.3d at 995, and Chesapeake B&M, Inc. v. Harford County, Md., 58 F.3d 1005, 1011-12 (4th Cir. 1995) (en banc), require us to do.

III.

We need not decide whether Raleigh's procedure would suffice as a means of review of other forms of expression or other exercises of First Amendment rights. We hold only that Steakhouse has shown little likelihood of prevailing in its challenge to Raleigh's special use permitting procedure as it pertains to topless barroom dancing. The district court accordingly did not abuse its discretion in denying preliminary injunctive relief.

AFFIRMED

14