**FRONT ROYAL AND WARREN COUNTY INDUSTRIAL PARK CORPORATION, Plaintiff,**

v.

**TOWN OF FRONT ROYAL, VIRGINIA, et al., Defendants.**

Civil A. No. 87–00019–H.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

April 11, 1996.

Robert C. Fitzgerald, Hazel & Thomas, Falls Church, VA, and Myron C. Smith, Fairfax, VA, for plaintiff.

David N. Crump, Jr., Adamson, Crump & Sharp. P.C., Front Royal, VA, and Glenn M. Hodge, and Mark D. Obenshain, Harrisonburg, VA, for defendants.

### MEMORANDUM OPINION

MICHAEL, District Judge.

■ This matter comes before the court upon the plaintiff's motion to reinstate a prior judgment of this court and to update the previous award of damages and attorneys' fees. In the prior judgment, this court held that the defendants had effected a so-called

"regulatory taking"[1] without providing just compensation in violation of the Takings Clause of the Fifth Amendment to the Constitution of the United States[2] where the defendants had concertedly denied and failed to furnish sewer service to property owned by the plaintiff notwithstanding the explicit mandate of a Virginia Annexation Court. The court previously held additionally that the defendants had likewise denied the plaintiff the equal protection under the laws in violation of the Equal Protection Clause of the Fourteenth Amendment[3] where the defendants could not establish that a legitimate governmental interest was furthered by failing to furnish sewer service to the plaintiff's property yet furnishing such service to property owed by citizens similarly-situated to the plaintiff. For the reasons stated below, the court will reinstate its prior judgment, as amended by this opinion, and will award the plaintiff damages of $359,441.47 and attorneys' fees of $105,317.19.

## I. Factual Background

In 1973 and in 1974, the plaintiff, Front Royal and Warren County Industrial Park Corporation, purchased parcels of land ultimately comprising eighty-six acres and then located in Warren County, Virginia. The cumulative purchase price was approximately $107,000.00. The plaintiff subdivided its property into sixteen lots suitable for industrial development. None of these lots had access to public water or sewer service, and the industrial properties could not be developed without such services. Accordingly, the plaintiff, along with adjacent residential property owners, petitioned for annexation by the defendant Town of Front Royal, Virginia (the "Town") to obtain public water and sewer utilities. Immediately prior to any annexation hearing, R. Alton Morrison, an owner of adjacent property, petitioned to intervene and to have his property included in the area sought to be annexed. Morrison's property was located across the street from the plaintiff's property.

On December 31, 1978, the Town annexed the plaintiff's property pursuant to an October 20, 1978 Order of a Virginia Annexation Court.[4] In its Order, the Annexation Court required the Town to construct water and collector sanitary sewer lines to serve the properties annexed and provided that such construction was to be completed no later than five (5) years from the effective date of the final order.[5] The Town zoned the plaintiff's lots for industrial use. In 1983, the Town requested and received a two-year extension of the five-year deadline.

Subsequent to the annexation of 1978 and prior to the installation of any water or sewer lines in the area annexed, the Town and Warren County jointly caused the creation of the Town and County Industrial Authority (the "Authority"), which had as its purpose the development into an industrial park the property located across the state route from

---

1. The term "regulatory taking" refers properly to the implicit denial of property rights through governmental regulation. The term "eminent domain" is defined as "[t]he power to take private property for public use by the state, municipalities, and private persons or corporations authorized to exercise functions of public character" and is typically considered an explicit confiscation of private property. Black's Law Dictionary 523 (6th ed. 1990).

2. U.S. Const. amend V ("[N]or shall private property be taken for public use without just compensation.")

3. U.S. Const. amend XIV, sec. 1 ("No state shall ... deny to any person within its jurisdiction the equal protection of the laws.")

4. The Virginia regulatory scheme for annexation proceedings is set forth in Va.Code Ann. § 15.1–1032 et seq. (Michie 1995).

5. The language of the provision is as follows:

 (2) *Sewer Facilities.* The Town of Front Royal shall proceed to construct interceptor and collector sanitary sewer lines in the areas herein decreed to be annexed and shall construct two pumping stations therein in accordance with the testimony of engineer expert witness, Massie, one to be located in the area annexed belonging to the original petitioner, and the other to be located in the area annexed belonging to R. Alton Morrison, as soon as they become reasonably necessary and it becomes economically feasible so to do to serve the residents of the annexed area or any industrial concerns which locate therein *but said improvements including the two pumping stations referred to above shall be completed within five years from the effective date of annexation.*

the plaintiff's property. During the same period, the plaintiff invested approximately $300,000.00 in preparing its annexed land for use as an industrial park. However, the plaintiff began to believe that the Town intended to locate the sewer trunk line on the property across from the plaintiff's property, which sewer trunk line would service all of the Morrison property but only three of the plaintiff's sixteen lots. Consequently, the plaintiff petitioned that the Annexation Court reconvene and requested that the Town be compelled to install the sewer trunk line to provide service to all of the lots belonging to the plaintiff. At a December 13, 1984 hearing before the Annexation Court, the Town assured the Annexation Court that the Town would install sewer lines to provide service to all of the plaintiff's property upon the plaintiff's application for the service. Accordingly, the reconvened Annexation Court determined that the Town was in substantial compliance with its 1978 Order.

Ironically, in July 1984, the plaintiff *had* made an application for sewer service. Through May 20, 1986, the Town's Council repeatedly "deferred" its decision on providing the sewer service to the plaintiff's property. On May 20, 1986, the Town's Mayor and Council agreed to deny the plaintiff's application at the next official meeting of the Council on June 9, 1986. On June 10, 1986, the Town's Council notified the plaintiff of the denial and stated:

> The mandate of the Annexation Court was service to the residents and industrial concerns of the annexed areas which are actually located therein. This the Town intends to honor. But, the Annexation Court did not intend that the Town be required to construct meaningless lines

without users, simply because a landowner so requested.

Finally, as of November 29, 1995, the Town had installed the sewer system to service all of the individual lots of the plaintiff's property.

## II. Procedural Background

On February 12, 1987, the plaintiff filed an action in this court seeking damages for the Town's failure to provide sewer service as required by the Order of the Annexation Court.[6] In *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* Nos. CA–87–0019 & CA–87–0020, 1988 WL 156285 (W.D.Va. Feb. 22, 1988) (*"Front Royal I"*), this court overruled the defendants' defense of absolute legislative immunity.[7] On appeal of this interlocutory order, the United States Court of Appeals for the Fourth Circuit affirmed. See *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 865 F.2d 77 (4th Cir.1989) (*"Front Royal II"*).

In *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 708 F.Supp. 1477 (W.D.Va.1989), *vacated,* 945 F.2d 760 (4th Cir.1991) (*"Front Royal III"*), this court overruled the defendants' defense on the ground of qualified executive immunity[8] and granted the plaintiff's motion for summary judgment for a violation of 42 U.S.C. § 1983 pursuant to a takings claim and an equal protection claim. In *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 749 F.Supp. 1439 (W.D.Va.1990), *vacated,* 945 F.2d 760 (4th Cir.1991) (*"Front Royal IV"*), this court awarded the plaintiff $489,072.40 in compensatory damages.

In *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 945 F.2d

---

6. A companion case, *McLaughlin v. Town of Front Royal,* CA–87–00020, was filed by the individual owners of residential property annexed but similarly denied water and sewer service. One of the plaintiffs in the companion case, Fred McLaughlin, was the sole shareholder of the instant plaintiff. Regretfully, the court has been advised that both plaintiffs in the companion case have died during the pendency of this litigation.

7. The Town and its officers argued that local legislators are absolutely immune from suit for decisions made in their capacities as legislators. This court rejected that argument and concluded that the Town and its officers were not entitled to legislative immunity because they were not acting in a *discretionary* capacity in denying the sewerage to the plaintiff's property. The Order of the Annexation Court removed any discretion from the Town and its officers.

8. *See* Part IV, *infra.*

760 (4th Cir.1991) ("*Front Royal V*"), the Court of Appeals vacated the decisions of this court in *Front Royal III* and *Front Royal IV*. The Court of Appeals reasoned as follows:

> At the heart of the case before us is the question whether Front Royal ever complied with the orders of the Annexation Courts. The answer requires interpretation of the Annexation Courts' orders, which is a determination that the Annexation Court was uniquely qualified to make. The annexation system as set up in Virginia is a complex scheme. It involves a court system set up specifically to deal with the annexation process. It provides for appeal to the Virginia courts if the town fails to comply with the Annexation Court's orders. We believe that this annexation scheme is sufficiently local in nature to warrant our abstaining from deciding the issues before us. Like the claims in [*Fralin & Waldron, Inc. v. Martinsville*, 493 F.2d 481 (4th Cir.1974) ], all of plaintiffs' federal claims necessarily depend upon the construction of state law—here the orders of the Annexation Courts. The courts of Virginia have much greater familiarity with the operations of the Virginia annexation scheme, and we believe that they should have the first opportunity to pass upon them.

*Id.* at 764–65 (internal citation omitted). The Court of Appeals believed also that there existed "other state remedies which might be available to plaintiffs." *Id.* at 765. Consequently, in accordance with the so-called "abstention doctrine" promulgated in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, *reh'g denied*, 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943), the Court of Appeals vacated the judgment of this court, yet remanded and instructed this court to retain jurisdiction pending the outcome of any state proceedings because such state proceedings may not fully dispose of all of the federal claims. *See id.*[9] Thus, the federal courts sent the plaintiff off to seek its state remedies.[10]

By letters dated December 6, 1991, counsel for the plaintiff requested that both the Town and Warren County respectively petition the 1978 Annexation Court to reconvene. Pursuant to Va.Code Ann. § 15.1–1047 (Michie 1995), the plaintiffs could not directly petition the Annexation Court to reconvene. Additionally, § 15.1–1047 prescribes a ten-year period of existence for annexation courts, which period in the instant matter had expired in 1988. On January 9, 1992, counsel for the defendants notified the plaintiff that it was unnecessary for the Town to respond to the plaintiff's December 6, 1991 request.

The plaintiff filed a Petition for Writ of Mandamus and Other Relief in the Warren County Circuit Court. On April 14, 1993, Judge John E. Wetsel, Jr., granted the plaintiff's request for issuance of a writ of mandamus to the Town. *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, Chancery No. 92–121 (Warren County Cir. Ct. April 14, 1993). Judge Wetsel concluded that

> [t]he 1978 Annexation Order required that the Town 'construct interceptor and collector sanitary sewer lines' to the Industrial Park, and the December 28, 1984, order of the reconvened Annexation Court did not alter the mandate of the 1978 Annexation

---

**9.** The Supreme Court of the United States denied the plaintiff's petition for a writ of certiorari. 503 U.S. 937, 112 S.Ct. 1477, 117 L.Ed.2d 620 (1992).

**10.** In *McLaughlin v. Town of Front Royal*, 810 F.Supp. 725 (W.D.Va.1992), the residential landowners moved this court to reinstate its prior judgment and argued that they had no remedy to pursue in state court both because the statutorily-prescribed life of the Annexation Court had expired and the Annexation Court could not be reconvened and because damages are not available in a Virginia court for a regulatory taking unless the wrongful action of the local government deprives the property owner of all use and all value of his property. This court examined the remand instructions of the Court of Appeals and reasoned that the plaintiffs were not required to pursue proceedings in state court where no state remedies existed. Consequently, this court reinstated its prior judgment in favor of the plaintiffs. Once again, however, the Court of Appeals vacated and remanded the action to be held in abeyance pending proceedings in Virginia state courts. *McLaughlin v. Town of Front Royal*, 21 F.3d 423, 1994 WL 112733 (4th Cir. April 5, 1994).

Order to provide sewer to the annexed area; therefore, the Town had no discretion as to whether to extend sewer to the properties in the annexed area, as it would have had in the absence of the annexation order.

*Id.,* slip op. at 13. The Circuit Court reiterated a prior ruling: "If the [Town's] application process has been properly followed, mandamus is an appropriate remedy to compel the construction of sewer lines to each of its sixteen lots." *Id.* (quoting *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* Chancery No. 92–121, slip op. at 10 (Warren County Cir. Ct. Oct. 23, 1992)). The court, however, reserved judgment on the issue of damages.

By Order dated June 30, 1993, Judge Wetsel denied the plaintiff damages. *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* Chancery No. 92–121 (Warren County Cir. Ct. June 30, 1993). Judge Wetsel concluded that pursuant to extant Virginia law, no action in inverse condemnation will lie "where the acts complained of are to confer a benefit upon the property, because where enhancement exceeds the damage to the property, there can be no award for damages to the [plaintiff's] property in a condemnation action." *Id.,* slip op. at 3 (citing *State Hwy. & Transp. Comm'r v. Linsly,* 223 Va. 437, 290 S.E.2d 834 (1982)). Accordingly, the court denied the plaintiff's damages claim based upon state law claims and expressly excepted the federal claims from the scope of its ruling: "The federal claims as a matter of comity should be resolved by the federal court in which they were first asserted and then adjudicated. The federal court retained jurisdiction of the companion case pending resolution of the state law claims." *Id.,* slip op. at 4.

The Supreme Court of Virginia agreed with the circuit court, ruling that the "Town's discretion is limited; the Town was required to exercise that discretion within five years from the date of the [1978] annexation decree." *Town of Front Royal v. Front Royal & Warren County Indus. Park Corp.,* 248 Va. 581, 449 S.E.2d 794, 797 (1994). The Virginia Court rejected the Town's argument that the 1984 annexation court order affirmed the Town's "purported unlimited discretion." *Id.* The court observed that the 1984 annexation court order served only to insure the Town's prompt compliance with the mandate of the 1978 order, since "[t]he reconvened annexation court's powers are limited to the enforcement of the terms and conditions of the 1978 decree. The annexation court may not be reconvened for the purpose of reconsidering or rehearing its prior orders." *Id.*

The Virginia Court, however, denied the plaintiff's appeal on the issue of damages. The plaintiff filed a Petition for Rehearing urging the court to revisit its holding in *City of Virginia Beach v. Virginia Land Investment Ass'n,* 239 Va. 412, 389 S.E.2d 312 (1990), in which case the court held that pursuant to Virginia state law no action alleging a taking will lie absent a total diminution in the value of the property. The court denied the plaintiff's petition, leaving the decision of the Circuit Court of Warren County the final decision in the case on the state law claims—that pursuant to Virginia law, there can be no award of damages or attorneys' fees. Accordingly, with the state-law legal landscape now fully developed, this court will rule on the federal takings, substantive due process, and equal protection claims that the state court declined to address.

### III. Abstention Doctrine

 As a threshold matter, this court believes it necessary to analyze whether its exercise of jurisdiction at this point in the development of the case is proper. More specifically, this federal district court must decide whether its exercise of jurisdiction is consistent with the principles and directive of the Court of Appeals in *Front Royal V.* The court must concede that it has encountered considerable difficulty in reconciling the Fourth Circuit's rationale in applying *Burford* abstention with the directive that this court retain jurisdiction. In other words, when the circumstances of a particular case justify federal court abstention pursuant to the principals set out in *Burford,* then dismissal of the case—a total abdication of federal jurisdiction in favor of the jurisdiction of

the state—is conceptually the preferable outcome. After careful analysis of the *Front Royal V* case, the cases of both the Supreme Court and the Fourth Circuit addressing *Burford* abstention, and considering the procedural history of this case, the court concludes that it is proper, if not necessary, that the federal court exercise its jurisdiction.

■ Generally, "abstention from the exercise of federal jurisdiction is the exception, not the rule." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). Yet, one of the exceptions is founded in the generally-accepted principle that a federal district court may properly restrain its exercise of equitable jurisdiction in certain circumstances where "a sound respect for the independence of state action requires the federal equity court to stay its hand." *Burford,* 319 U.S. at 334, 63 S.Ct. at 1107. In *Burford,* for example, the Supreme Court held that the federal court should not intervene where the Texas legislature had devised a complex system for expeditious and adequate judicial review of orders of the Texas Railroad Commission and where conflicts between federal and state courts' divergent interpretations of state law were likely to interfere with the successful application of Texas statutes regarding oil and gas conservation—public policy concerns of paramount economic importance to the state. *Burford,* 319 U.S. at 334, 63 S.Ct. at 1107. Thus, the so-called *Burford* abstention doctrine which has emerged indicates a deference of federal courts to state courts where circumstances of a case reveal a presence of both unclear questions of state law and the need for state- or locality-controlled administration, regulation or development of a state's public policy. *See also Alabama Public Serv. Comm'n v. Southern R.R.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *but see McNeese v. Board of Educ.,* 373 U.S. 668, 674–76, 83 S.Ct. 1433, 1437–38, 10 L.Ed.2d 622 (1963) (holding that *Burford* abstention was not applicable in a case where the asserted right was federal in origin and where it was unclear whether state law provided an administrative remedy sufficiently adequate to preclude prior resort to a federal court for protection of the federal right); *Zablocki v. Redhail,* 434 U.S. 374,

379 n. 5, 98 S.Ct. 673, 677 n. 5, 54 L.Ed.2d 618 (1978) ("There is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.").

In *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("*NOPSI* "), the Court provided an enlightening discussion of the character and magnitude of the challenged state policy required to justify *Burford* abstention:

> Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*Id.,* at 361, 109 S.Ct. at 2514 (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). In *NOPSI,* the Court found that *Burford* abstention was not necessary in a case challenging the decision of a localized rate-making body to deny a utility company a rate increase for electrical services. The Court reasoned that because electricity was not primarily bought and sold within a predominately local market, federal court review of the local rate-making body's decision would not disrupt state resolution of distinctively local regulatory facts or policies. Thus, the *NOPSI* decision provided welcome clarification to the doctrine of *Burford* abstention: the state administrative or regulatory system must have as a primary purpose the achieving of uniformity within a state, and federal judicial review would disrupt the proceedings and would undermine the desired uniform application of state law.

The Fourth Circuit has had occasion to address and to apply *Burford* abstention in cases involving land-use regulation. In *Fra-*

*lin & Waldron, Inc. v. City of Martinsville,* 493 F.2d 481 (4th Cir.1974), the court held that "Virginia courts have extensive familiarity and experience with [the correct construction of local land use law as to special use permits], and we believe that they should have the initial opportunity to pass upon them." *Id.* at 482.[11] In *Browning–Ferris, Inc. v. Baltimore County, Md.,* 774 F.2d 77, 79 (1985), the court found that the *Burford* requirement that a complex regulatory scheme be involved for a federal district court to abstain properly was sufficiently present in a case involving the denial of a waste disposal permit where the Maryland state statutes and regulations "governing landfill operations are lengthy and detailed and involve complex scientific questions that must be reviewed before a permit for a waste disposal facility is approved." *See also Meredith v. Talbot County, Md.,* 828 F.2d 228, 231 (4th Cir.1987) ("the procedures, programs, statutes, regulations, planning boards, and officials involved in the subdivision approval process qualify zoning in Talbot County, Maryland as being governed by a complex state regulatory scheme.").

Following *Front Royal V,* in *Pomponio v. Fauquier County Bd. of Supervisors,* 21 F.3d 1319 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 192, 130 L.Ed.2d 125 (1994), the court held that a federal district court properly invoked *Burford* abstention in a case where the developer of a proposed subdivision challenged the decision of a planning commission and of the county board of super-

visors finding that the developer's proposal was not in compliance with applicable county zoning and subdivision ordinances. In *Pomponio,* the court reasoned that "in the usual case federal courts should not leave their indelible print on local and state land use and zoning law by entertaining these cases and, in effect, sitting as a zoning board of appeals ... or a Planning Commission, or Board of Supervisors...." *Id.* at 1327 (citation omitted). Consequently, the *Pomponio* court held that "[i]n cases in which plaintiff's federal claims stem solely from construction of state or local land use or zoning law, not involving the constitutional validity of the same and absent exceptional circumstances not present here, the district courts should abstain under the *Burford* doctrine to avoid interference with the State's or locality's land use policy." *Id.* at 1328. This court believes that the *Pomponio* opinion provides much needed guidance to this court in addressing *Front Royal V.*

In *Front Royal V,* the Court of Appeals observed that "[t]he annexation system as set up in Virginia is a complex scheme." *Front Royal V,* 945 F.2d at 764. The Court of Appeals was influenced by the Virginia statutory scheme permitting the Annexation Court to reconvene during its ten-year period of existence "to enforce the performance of the terms and conditions under which annexation was granted." [12] *Front Royal V* (citing Va.Code Ann. § 15.1–1047(c)). Additionally, the court noted that the Virginia Code provided for appeal to Virginia courts where

---

**11.** In *Fralin & Waldron,* the court stated that the case was controlled by *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). This court notes that *Thibodaux* relied upon the so-called *"Pullman* abstention doctrine" promulgated in *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman,* "the Supreme Court held that abstention is appropriate when a court must resolve intricate and unsettled questions of state law before deciding federal constitutional issues." *Graham v. County of Albemarle,* 826 F.Supp. 167, 171 (W.D.Va.1993). Nonetheless, the reasoning of *Fralin & Waldron* is relevant to the issue in the instant case and indeed was relied upon by the Fourth Circuit in *Front Royal V.* As the Fourth Circuit noted recently, "[a]lthough our reasoning [in *Fralin & Waldron*] was more consistent with *Burford* abstention, we concluded that abstention

was warranted on the basis of *Thibodaux."* *Cf. Caleb Stowe Assocs v. County of Albemarle, Virginia,* 724 F.2d 1079 (4th Cir.1984).

**12.** It is noteworthy that the Court of Appeals acknowledged that the statutory ten-year period of existence for the 1978 Annexation Court had expired; however, the court continued to believe that abstention was proper because, *inter alia,* "it might be that the Annexation Court[] could reconvene under the special circumstances of this case," *id.,* at 764 n. *, notwithstanding the clear language of the statute that the annexation court "shall remain in existence for a period of ten years from the effective date of any annexation order entered...." Va.Code Ann. 15.1–1047. After examining the procedural history of this case following *Front Royal V,* this court believes that it is clear that the 1978 Annexation Court cannot be reconvened.

localities fail to comply with annexation orders. *See id.* (citing Va.Code Ann. § 15.1–1048). *See also Meredith*, 828 F.2d at 232 ("[S]everal levels of state review of zoning decisions exist, including: (1) an appeal from the Talbot County Planning Commission to the County Board of Appeals; (2) an appeal from the County Board of Appeals to the Circuit Court for Talbot County; and (3) a complaint seeking declaratory and injunctive relief in the Circuit Court for Talbot County.") (footnotes omitted). *But see Educational Servs., Inc. v. Maryland State Board for Higher Educ.*, 710 F.2d 170, 173 (4th Cir.1983) (holding that *Burford* abstention was not necessary where "the Maryland state courts do not stand in any special relationship of technical oversight or concentrated review to the educational certification process").

Additionally, because *Front Royal V* was a case in which its factual circumstances ostensibly involved land-use regulation, the Fourth Circuit determined that this court should have abstained from exercising its jurisdiction, pursuant to *Burford. See Pomponio*, 21 F.3d at 1327 ("[C]ases involving questions of state and local land use and zoning law are a classic example of situations in which 'the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' ") *Id.* at 1327 (citing *NOPSI*, 491 U.S. at 361, 109 S.Ct. at 2514.) However, this court believes that the instant matter is clearly distinguishable from the prior cases of the Fourth Circuit. In all of the cases mentioned above, it is undeniably true that the challenged conduct or activity involved application of local or statewide land-use regulations or policies by local or statewide governmental entities vested with both quasi-legislative and quasi-executive discretion to construe and to apply the regulations or policies in a manner which would promote across-the-board uniformity. *Fralin & Waldron* (special use permits), *Browning–Ferris* (statewide regulations governing waste disposal); *Meredith* (zoning board approval for subdivision proposal); *Pomponio* (planning commission approval for subdivision proposal). By contrast, the plaintiff in the instant

matter does not challenge a decision by a local zoning board or planning commission regarding the discretionary application of zoning laws or ordinances. For example, the plaintiff does not allege that the 1978 Annexation Court erred in ordering the annexation of its property; the plaintiff does not allege that the 1978 Annexation Court erred in granting the Town a five-year period in which to provide sewer service; the plaintiff does not allege that the 1978 Annexation Court erred in extending to seven years the period in which the Town was to provide sewer service; and, the Plaintiff does not challenge the Town's refusal or failure to provide sewer service during the cumulative seven-year period within which period the Town was vested with considerable discretion in complying with the Order of the 1978 Annexation Court. To the contrary, the plaintiff challenges the Town's decision not to comply with the clear mandate of the 1978 Annexation Court to provide the plaintiff's property with sewerage by December 31, 1985. To be sure, neither the Town, nor the Town's officials, nor Warren County, nor the Commonwealth of Virginia has defended or intervened in this matter on the ground that it is in the best interest of uniform application of state policy that the state courts have exclusive jurisdiction to determine whether a local governmental entity may violate the clear mandate of an annexation court without violating guarantees resident in the federal constitution. The issue in the instant case does not question the discretionary application of local law-use or zoning law, of which conflicting federal judicial interference could jeopardize uniformity; rather, the issue in the instant case questions the constitutionality of one discrete decision of a single local governmental entity not to provide sewer service to a specific parcel of property, notwithstanding the particularized order of an annexation court. The adjudication of this issue does not require the federal court to sit as a board of appeals, or a Planning Commission, or a Board of Supervisors, or a Town Council, *see Pomponio;* rather, this case requires only that the federal court adjudicate whether the Town's refusal to comply with a non-discretionary mandate effects either a taking or a deprivation of a property interest

without due process of law in violation of the federal constitution—conduct in which the Virginia courts do not stand in any special relationship of technical oversight or concentrated review. *See Educational Servs.* Therefore, in light of the Fourth Circuit's reasoning in *Pomponio*, this court does not believe that the Fourth Circuit would currently conclude that *Burford* abstention is proper under the unusual circumstances of this case.[13]

### IV. Qualified Executive Immunity

■ The defendants raise once again their argument that the court should dismiss this action on the ground of the affirmative defense of qualified executive immunity. In a nutshell, the defendants argue that the 1978 Order of the Annexation Court vested considerable discretion in the defendants regarding both the timing of providing sewerage to the plaintiff's property and the actual providing of sewer lines. In essence, the defendants seem to argue that the 1978 Order was not an absolute directive but rather a mere guide or suggestion, pursuant to which the defendants retained their usual discretion to engage in cost-benefit analyses regarding the public necessity of providing sewer services to the plaintiff's property. In *Front Royal III*, this court rejected the defendants' defense on the ground of qualified executive immunity and will again do so in this decision, as modified by this memorandum opinion.

In *Front Royal III*, this court distinguished first between *discretionary* and *ministerial* functions of governmental officials. In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Court held that *"government officials performing discretionary functions,* generally are shielded from liability for civil dam-

ages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (emphasis added). *See also Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("Our cases have accommodated ... conflicting concerns by generally providing *government officials performing discretionary functions* with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.") (emphasis added); *Bright v. McClure,* 865 F.2d 623, 625–26 (4th Cir.1989) ("Public officials ... are clothed with qualified immunity *in the performance of discretionary functions* when the action does not violate clearly established statutory or constitutional rights of which the official knows or reasonably should be aware.") (emphasis added); *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (The doctrine of qualified immunity "shields government officials performing *discretionary—as distinct from ministerial—functions* from liability for damages arising from their actions.") (emphasis added). In *Front Royal III,* this court reasoned that "[i]n order to make use of the qualified immunity protection, defendants would have to show that their provision of sewer lines to the annexed areas—or their refusal to provide such lines—was a discretionary function appropriate to an executive, not a ministerial act." *Front Royal III,* 708 F.Supp. at 1481. The court concluded, therefore, that "the provision of sewer lines, under the specific aegis of [a] very explicit annexation order[ ], was not a discretionary function emblematic of the executive and suitable for qualified immunity, but was undisputedly a ministerial function." *Id.* (footnote omitted). The court affirms generally its conclusion in *Front Royal III.*[14]

---

**13.** If the court concluded that *Burford* abstention is proper under the circumstances of this case, then dismissal of the case would be the usual disposition. *See Pomponio,* 21 F.3d at 1328 ("It is now accepted that the appropriate course of action in a *Burford* abstention case is to dismiss the suit.") (citing 17A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, *Federal Practice & Procedure: Civil,* § 4025 (1988)). *See also Meredith,* 828 F.2d at 232.

**14.** An overwhelming weight of authority from state courts in this very case echo this federal court's determination that the function challenged here is a non-discretionary function. *See Front Royal & Warren County Indus. Park Corp.,* 248 Va. 581, 449 S.E.2d 794, 797 (1994); *Front Royal & Warren County Indus. Park Corp.,* Chancery No. 92–121 (Warren County Cir.Crt. Apr. 14, 1993).

■ However, the fact that a government official is being sued for a non-discretionary act does not solely render the qualified immunity inquiry unavailable. *See Withers v. Levine,* 615 F.2d 158, 163 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980) (noting that it was a mistake for the plaintiff to address the defendants' qualified immunity defense in terms of the distinction between discretionary and ministerial actions.) In *McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir.1995), the court held that qualified immunity is available for officials who undertake ministerial acts, so long as the ministerial duty falls within the scope of the official's overall discretionary authority. *See also Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994) (holding that the assertion that "an act must be discretionary to receive the protection of qualified immunity" was "an overly narrow interpretation of the term 'discretionary authority' "); *McIntosh v. Weinberger,* 810 F.2d 1411, 1432 (8th Cir.1987) (finding "no recent case . . . in which a court has rejected qualified immunity simply because the official in question was performing a ministerial duty"), *vacated and remanded on other grounds sub nom., Turner v. McIntosh,* 487 U.S. 1212, 108 S.Ct. 2861, 101 L.Ed.2d 898, *cert. denied,* 487 U.S. 1217, 108 S.Ct. 2870, 101 L.Ed.2d 905 (1988); *Coleman v. Frantz,* 754 F.2d 719, 727 (7th Cir.1985) (noting that "it would be unwise to engage in a case by case determination of Section 1983 immunity based upon the ministerial versus discretionary nature of the particular official act challenged."); *Griswold v. Alabama Dep't of Indus. Relations,* 903 F.Supp. 1492, 1498 (M.D.Ala.1995) ("Whether a government official acts within discretionary authority turns not on the ministerial versus discretionary nature of an act, but rather on an evaluation of the official's duties

and authority."). In *Coleman,* the court identified the elements of discretionary authority as (1) actions "undertaken" pursuant to the performance of . . . duties, and (2) actions "within the scope of . . . authority." *Coleman,* 754 F.2d at 728. In the instant case, the court cannot conclude that the Town officials were acting pursuant to any alleged "discretionary authority." While it is undeniably true that in the general and usual context members of the Town's Council may possess considerable discretion in determining the necessity of providing public utilities, it is equally true that members of the Town's Council are wholly without discretion to make such a determination in the discrete context of annexation. Section 15.1–1042(f) of the Virginia Code provides that the annexation court shall have the power and the discretion to determine what capital improvements by the Town are necessary to bring the annexed area up to a standard equal to that of the remainder of the town.[15] Section 15.1–1042(f) explicitly vests in the annexation court—not the Town officials—the discretion to determine the necessity for certain capital improvements to be provided to the annexed area. Thus, when the defendants acted to deny the plaintiff sewerage to the plaintiff's property, the defendants' were in essence acting *ultra vires*—without the scope of their authority. Indeed, the record suggests that the defendants knew that they were acting beyond the scope of their authority because the Town's attorney had advised the Council that the Order of the Annexation Court left the Town with no discretion in the decision whether to provide sewer service to the plaintiff's property. Accordingly, the court reaffirms its conclusion made in *Front Royal III* that the "defendants are singularly ill-placed to attempt to make use of a qualified

**15.** Pursuant to § 15.1–1042(f), the annexation court shall have the power, *inter alia,*

> [t]o prescribe what capital outlays shall be made by the city in the area after annexation; provided, that the court shall require of the city the provision of any capital improvements which in its judgment are essential to meet the needs of the annexed area and to bring the same up to a standard equal to that of the remainder of the city; and provided further, that the court may, in its discretion, require as a condition of annexation the provision of cap-

> ital improvements in addition to those specified in the annexation ordinance when the same are required to meet the needs of the area annexed.

Va.Code Ann. § 15.1–1042(f) (Michie 1995). The court notes that subsection (f) does not explicitly equate a "city" with a "town" as does the remainder of the applicable sections of § 15.1–1042; however, the court cannot conceive of a credible reason for distinguishing cities from towns in the requirement of providing capital improvements to an annexed area.

immunity defense." *Front Royal III*, 708 F.Supp. at 1482.[16]

## V. Section 1983

Title 42, United States Code, Section 1983 permits claimants to pursue civil rights actions alleging that a state actor under the color of law allegedly deprived the claimant of an underlying constitutional right.[17] In the instant matter, the plaintiff brought its § 1983 complaint alleging, *inter alia*, a deprivation of constitutional rights guaranteed pursuant both to the Fifth Amendment's Takings Clause and to the Fourteenth Amendment's Due Process Clause. The court will bifurcate its discussion of the § 1983 action based upon these alternative claims.[18]

### A. Takings Claim

 As a threshold matter, the court must determine whether the plaintiff's § 1983 action pursuant to a takings claim is procedurally ripe for this court to consider. In *Williamson County Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Court held that a claimant could not pursue a takings claim in federal court where the state court had not adjudicated, and thereby had not denied, just compensation on an inverse condemnation claim. In *Williamson County*, the claimant sought damages arising from a change in a local zoning ordinance whereby the allowable density of dwelling units in a so-called "cluster development" was reduced. The claimant had not pursued, however, a state court action sounding in inverse condemnation. The *Williamson County* Court reasoned that "because the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." *Id.* at 195 n. 13, 105 S.Ct. at 3121 n. 13. Thus, in the instant matter, this court must determine whether the plaintiff has availed itself of the full panoply of state proceedings for inverse condemnation in an attempt to receive just compensation for the deprivation of its property.[19]

16. In *Front Royal III*, this court concluded additionally that the defendants could not have objectively believed that they were acting in good faith by refusing to provide sewerage to the property owned by the plaintiff because an objectively reasonable person would have known that the defendants were under a legal obligation to provide such sewer service, pursuant to the clear language of the 1978 Order of the Annexation Court. *See id.* The court's conclusion is bolstered by the fact that the Town's attorney notified the defendants that the 1978 Order of the Annexation Court was a mandate that the Town provide sewer service to the plaintiff's property. Inasmuch as the court's determination in *Front Royal III* on the question of the defendant's good faith provides an alternative basis for overruling the defendants' defense of qualified executive immunity in the instant matter, the court reaffirms its prior determination.

17. 42 U.S.C. § 1983 provides in relevant part that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights privileges, or immunities secured by the Constitution and laws, shall be liable to the

party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983 (1995).

18. This court believes that bifurcation of its discussion is necessary because of the analytical distinction procedurally between the "taking claim" and the "due process claim." *See* Richard G. Carlisle, *The Section 1983 Land Use Case: Justice Stevens and the Hunt for the Taking Quark*, 16 Stetson L.Rev. 565, 566 (1987) (noting that courts "stress[] the *finality* of governmental action required to show acquisition of a governmental interest in property sufficient to constitute a taking, yet recognizing that government must treat an individual with fundamental fairness in the *process* ") (emphasis in original).

19. The analysis undertaken by the court in the instant proceeding differs from the analysis undertaken in *Front Royal III*. Although not explicitly outlined, in *Front Royal III*, this court determined that the *Williamson County* requirement was satisfied because the plaintiff lacked any viable state remedy. In *Williamson County*, the Court concluded that "if a State provides an *adequate* procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedures and has been denied just compensation. *Id.* at 195, 105 S.Ct. at 3120 (emphasis

**1144**

In *Front Royal & Warren County Indus. Park Corp.*, Chancery No. 92–121 (Warren County Cir. Ct. Apr. 14, 1993), the Circuit Court held that mandamus was the appropriate remedy to compel the construction of the sewer lines. *Id.* at 13. In *Front Royal & Warren County Indus. Park Corp.*, Chancery No. 92–121 (Warren County Cir. Ct. June 30, 1993), the Circuit Court held that "[t]he statutory provisions governing the issuance of the extraordinary writ of mandamus make no provision for the award of damages incident to the issuance of the writ of mandamus." *Id.* at 3 (citing Va. Code Ann. §§ 8.01–644 to 653.1). Additionally, the court held that the plaintiff could not recover damages based upon a claim of inverse condemnation pursuant to extant Virginia law:

> The gravamen of Petitioner's claim is that it was denied the enhancement in market value to be derived from the availability of public sewer to each of the Petitioner's lots. No inverse condemnation action will lie in Virginia where the acts complained of are to confer a benefit upon the property, because where enhancement exceeds the damage to the property, there can be no award for damages to the Petitioner's property in a condemnation action.

*Id.* at 3 (citing *State Hwy & Transp. Comm'r v. Linsly*, 223 Va. 437, 290 S.E.2d 834 (1982)).[20] In *Front Royal & Warren County*

added). In *Williamson County*, the Court observed that Tennessee law provides a statutory scheme for inverse condemnation proceedings and that the "[r]espondent has not shown that the inverse condemnation procedure is unavailable or inadequate." *Id.* at 196–97, 105 S.Ct. at 3122. In *Front Royal III*, this court determined that the Virginia procedures for providing just compensation were inadequate to provide a remedy for the plaintiff under the circumstances of this case. The potential remedial options available from the Annexation Court were both not available to the plaintiff and limited in scope of remedy. *See* Part II, *supra*. Also, the Annexation Court's power to order monetary damage awards is limited to awarding "attorneys' fees, court and other reasonable costs...." Va. Code Ann. § 15.1–1047(c) (Michie 1995). Finally, this court concluded that the procedures available to the plaintiff pursuant to Virginia law to provide just compensation were inadequate because it was unlikely that the Town's refusal or failure to provide sewerage would constitute a taking under Virginia law. *See City of Virginia Beach v. Virginia Land Investment Ass'n*, 239 Va. 412, 389 S.E.2d 312 (1990) ("*VLIA*") In *VLIA*, the Virginia Court held that an invalidated ordinance "did not constitute a taking because VLIA was not deprived of *all economically viable uses of its property.*" *Id.*, 389 S.E.2d at 314 (emphasis added). The *VLIA* court found as dispositive of the temporary taking issue the fact that VLIA could have leased its property after the property was downzoned and was therefore not deprived of all economically viable uses. *See id.*

In *Front Royal V*, the Court of Appeals disagreed with this court's conclusion that the state remedies were either unavailable to the plaintiff or were inadequate to redress the plaintiff's injury. The appellate court suggested that the annexation court might be reconvened to provide relief to the plaintiff. In addition, the court noted that Virginia courts recognize a common law cause of action to protect the Virginia constitutional right of due process where property owners may have been unlawfully deprived of

their property. *See Front Royal V*, 945 F.2d at 765 (citing Va. Const. art. I, amend. 11; *Groves v. Cox*, 559 F.Supp. 772, 777 (E.D.Va.1983); *Morris v. Elizabeth River Tunnel Dist.*, 203 Va. 196, 123 S.E.2d 398 (1962)). *See also McLaughlin*, 1994 WL 112733 at *1 ("The Virginia Supreme Court recognized that restrictions on use of private property may constitute a 'taking' of one of the most valuable components of the package of private property rights, and, absent just compensation, such taking is a denial of due process of law.") (quoting *Board of Supervisors v. Rowe*, 216 Va. 128, 216 S.E.2d 199, 210 (1975)).

20. The defendants argue that this statement of the Circuit Court is merely "advisory" in fact because the plaintiff allegedly "abandoned and waived any entitlement to compensation under established state remedies or procedures." Defendants' Memorandum in Opposition to the Motion of the Plaintiff for the Court to Exercise Jurisdiction and to Reinstate the Judgment and In Support of the Defendants' Motion for Entry of Final Judgment, at 2. The defendants claim that the plaintiff has failed to follow the directive of the Fourth Circuit in *Front Royal V*. The defendants claim that the plaintiff ignored its duty to pursue state remedies in favor of pressing its remedies pursuant to federal law. It seems to this court that the defendants seek to have this court rule that because the plaintiff conceded to a mere truism—that monetary damages were not available to a claimant pursuant to a claim of inverse condemnation pursuant to extant law in the Commonwealth of Virginia—then the plaintiff must be found to have failed to pursue its state remedies. The court cannot accept such a proposition. Additionally, when the Supreme Court of Virginia denied the plaintiff's petition that it reconsider its decision in *VLIA*, the Supreme Court essentially reaffirmed its decision in *VLIA* and validated the plaintiff's representations before the Circuit Court.

Furthermore, the court notes that the Court of Appeals for the Ninth Circuit has adopted a so-

*Indus. Park Corp.*, 248 Va. 581, 449 S.E.2d 794 (1994), the Supreme Court of Virginia affirmed the judgment of the circuit court. Additionally, the Virginia court denied the plaintiff's petition for rehearing on the issue of whether an action sounding in inverse condemnation will lie pursuant to Virginia law where the property owner is not deprived of all economically viable uses of its property. Accordingly, the court concludes that the plaintiff has utilized the procedures available pursuant to Virginia law to seek monetary damages for an alleged taking of private property. At the very least, it is clear that the strictures of *Williamson County* have been met in this case because the plaintiff has been denied just compensation pursuant to the procedures of Virginia law. Therefore, the court will proceed to the substance of the plaintiff's takings claim.

■ The Fifth Amendment provides, *inter alia*, that the government shall not deprive any person of private property without just compensation, and the takings clause component of the Fifth Amendment is made applicable to the states via the Fourteenth Amendment. *See Chicago, B. & Q. R.R. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987). It is generally accepted that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

■ As an initial matter, the court acknowledges that the factual circumstances of this case do not fit neatly into the generally-accepted conceptualization of regulatory takings cases. The court is convinced, however, that the factual circumstances of this case share elements of common identity with the factual circumstances of cases arising neatly under claims of regulatory takings: the case involves governmental action (or inaction) which implicitly deprives a property owner of a right or an estate in property. This court is mindful of the Supreme Court's pronouncement that the Court "has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' " *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). Indeed, the Court's takings jurisprudence is frequently characterized as comprising "ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action—that have particular significance." *Id.* (citing *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659.). Having expressed this caveat, the court will proceed to identify certain elements of the Supreme Court's self-styled "ad hoc inquiries," which elements the court found instructive in adjudicating the instant matter.

■ The Supreme Court has not required that the deprivation of the property right be a permanent deprivation in order to

---

called "futility exception" to the threshold requirement of a final decision. "Under this exception, the requirement of the submission of a development plan is excluded if such an application would be an 'idle and futile act.' " *Kinzli v. City of Santa Cruz*, 818 F.2d 1449 (9th Cir.1987), *cert. denied*, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988) (quoting *Martino v. Santa Clara Valley Water Dist.*, 703 F.2d 1141, 1146 n. 2 (9th Cir.), *cert. denied*, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983)). While this court

will not go so far as to adopt a "futility exception" *per se* to the requirement that a claimant pursue proceedings sounding in inverse condemnation in state court before pursuing federal claims in federal court, the court does believe that at some point it becomes a futile and idle exercise to require a claimant to argue a premise of law which the highest court of a jurisdiction has explicitly and unequivocally rejected. The court believes that the instant case has arrived at that point.

constitute a compensable taking. In *First English*, the Court held that "[w]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *First English*, 482 U.S. at 321, 107 S.Ct. at 2389. In *First English*, the appellant church claimed that a temporary taking was effected where a Los Angeles county interim ordinance prohibited the reconstruction of buildings in an area damaged by forest fires and designated as an interim flood protection area. The *First English* Court relied upon "principles normally governing the taking of a right to use property temporarily"[21] in concluding that " 'temporary' takings which ... deny a landowner all use of his property, are not different in kind from a permanent taking, for which the Constitution clearly requires compensation." *First English*, 482 U.S. at 318, 107 S.Ct. at 2388. *See also San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting) ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable."). The *First English* Court held that "[i]nvalidation of the ordinance or its successor ordinance after [a considerable] period of time, though converting the taking into a 'temporary' one, is not a sufficient remedy to meet the demands of the Just Compensation Clause." *Id.* at 319, 107 S.Ct. at 2388.

The Court has described "property rights" as "the rights 'to possess, use and dispose of [a thing].' " *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868 (1982) (quoting *General Motors Corp.*, 323 U.S. at 378, 65 S.Ct. at 359); *see also Buchanan v. Warley*, 245 U.S. 60, 74, 38 S.Ct. 16, 18, 62 L.Ed. 149 (1917) ("Property is more than the mere thing.... It includes the right to acquire, use, and dispose of it."). The court has

found an unconstitutional taking without just compensation in a case involving in part the deprivation of a property owner's right to control the use of a small portion of roof space. *Loretto*, 458 U.S. at 435, 102 S.Ct. at 3176. *See also First English*, 482 U.S. at 322, 107 S.Ct. at 2389 (finding a taking where a Los Angeles County ordinance denied a property owner all use of its property for a considerable period of years). *But see Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (upholding a Los Angeles city ordinance denying the property owner the right to use as a brickyard his property located with the City).

The Supreme Court has found that categorical treatment of claims of compensable regulatory takings is appropriate in situations where a property owner has been deprived of all economically and beneficial uses of land. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992) ("when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking") (emphasis in original). *See also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370–71, 69 L.Ed.2d 1 (1981); *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). In *Lucas*, the Court held that a taking of private property without just compensation had been effected where the Coastal Commission established certain building setback boundaries based upon landward-most points of erosion and where such boundaries prohibited the property owner from building any structure on his property and denied the property owner his invest-

---

**21.** The *First English* Court in its opinion cited *Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729, *reh'g denied*, 327 U.S. 818, 66 S.Ct. 813, 814, 90 L.Ed. 1040 (1946); *United*

*States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). These cited cases involved the temporary appropriation of private property by the federal government during World War II.

ment-backed expectations in the property. However, the *Lucas* majority conceded that "[regrettably,] the rhetorical force of [the] 'deprivation of all economically feasible use' rule is greater than its precision, since the rule does not make clear the 'property interest' against which the loss of value is to be measured." *Id.* at 1016 n. 7, 112 S.Ct. at 2894 n. 7.[22] Thus, the *Lucas* Court left unresolved the question how to determine whether a less-than-total deprivation of all uses constitutes either a deprivation of all economically beneficial uses of the burdened portion of the property or a mere diminution in the value of the property. *See id.*

In *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) (*"Florida Rock IV"*), the court expanded upon the *Lucas* Court's "touching" upon the question of a partial regulatory taking and held that "[n]othing in the language of the Fifth Amendment compels a court to find a taking *only* when the Government divests the total ownership of the property; the Fifth Amendment prohibits the uncompensated taking of private property without reference to the owner's remaining interests." *Id.* at 1568 (emphasis in original). The *Florida Rock* court bifurcated the inquiry left unresolved in *Lucas* regarding when a partial loss of economic use of property crosses the line from a noncompensable "mere diminution" in value to a compensable "partial taking." *Id.* at 1570. The *Florida Rock IV* court noted that the answer to this inquiry required resolution of two subsidiary inquiries: (1) "whether a regulation must destroy a certain proportion of a property's economic use or value in order for a compensable taking of property to occur;" *id.* at 1568; and (2) "how to determine, in any given case, what that proportion is." *Id.*

In *Florida Rock IV,* the appeals court vacated a United States Claims Court's determination that the Army Corp of Engineers' denial of a permit under § 404 of the Clean Water Act deprived the claimant of all value in its land and, therefore, effected a taking. The court explained that "the economic impact of the regulation on the claimant [is] measured by the change, if any, in the fair market value caused by the regulatory imposition." *Id.* at 1565.[23] The court instructed the Claims Court on remand to

consider, along with other relevant matters, the relationship of the owner's basis or investment, and the fair market value before the alleged taking to the fair market value after the alleged taking. In determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to regulation, cannot be ignored.

*Id.* at 1567 (quoting *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 905 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (*"Florida Rock II"*)). Furthermore, the court concluded that the determination of loss of economic use must rest upon a case-by-case analysis and instructed the lower court to consider:

are there direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory

**22.** The "problem" of determining the "property interest" against which the loss of value is to be measured is commonly characterized as the problem of determining the denominator of the fraction used in the takings formula. *Keystone Bituminous,* 480 U.S. at 497, 107 S.Ct. at 1248. In *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), the Court held that "where an owner possesses a full 'bundle' or property rights, the destruction of one 'strand' of the bundle is not a taking because the aggregate must be viewed in its entirety."

**23.** 'Fair Market Value' for the purpose of valuating land and improvements taken under the power of eminent domain, is the amount of money which, as of the date of valuation, an informed and knowledgeable purchaser willing, but not obligated, to buy property would pay to an informed and knowledgeable owner willing, but not obligated, to sell it. Consideration must be given to the following:
(a) all uses for which the land is suited and might be applied including, but not limited to present use or highest and best available use;
(b) the existing zoning or other restrictions upon use, and the reasonable probability of a change in those restrictions; and,
(c) the period of time within which such sale could reasonably be effectuated.
4 Nichols, The Law of Eminent Domain § 12.02[0] at 12–75 to 12–76 (1994) (footnotes omitted).

environment? Or are benefits, if any, general and widely shared through the community and the society, while the costs are focused on a few? Are alternative permitted activities economically realistic in light of the setting and circumstances, and are they realistically available? In short, has the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all.

*Id.* at 1571. Thus, with this sketch of applicable principles in mind, the court turns to a substantive analysis of the instant matter.

The defendants argue, of course, that the plaintiff has not been deprived of all possible uses of its land. It may be true that the plaintiff retained the right to exclude others from its property and to dispose of its property, and it is undeniably true that these attributes of property ownership are essential in the classical conception of property;[24] however, it is equally true that the defendants' failure to provide sewer service to the plaintiff's property may have effectively deprived the plaintiff of a co-existent essential attribute of ownership—the right to use the property in a manner consistent with the property owner's investment-backed expectations.

Turning to the first factor identified by the court in *Florida Rock II*, the court finds that the fair market value of the plaintiff's property in 1985 is not quite sufficient to permit the plaintiff to recoup its investment in the property. As discussed *infra*, the plaintiff's expert testified that the 1985 fair market value of the property without sewer service was approximately $405,000.00. The plaintiff has submitted evidence suggesting that it has

an actual cost basis in the property of approximately $407,000.00.[25] Thus, while the plaintiff could conceptually recoup most of its investment through the sale of the property without sewer service, it is clear that the plaintiff would not better its investment or realize its reasonable investment-backed expectations.

The court has considered the other factors enumerated by the court in *Florida Rock II*. First, the defendants' conduct has generated widespread benefits to the community and to a discrete group of similarly-situated citizens. In *Nollan*, the Court reiterated that "[o]ne of the principal purposes of the Takings Clause is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Nollan*, 483 U.S. at 836 n. 4, 107 S.Ct. at 3148 n. 4 (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)); *Florida Rock IV*, 18 F.3d at 1571 ("Marketplace decisions should be made under the working assumption that the Government will neither prejudice private citizens, unfairly shifting the burden of a public good onto a few people, nor act arbitrarily or capriciously, that is, will not act to disappoint reasonable investment-backed expectations."). The defendants' conduct in the instant case has run widely afoul of this constitutional mark. The Authority undoubtedly reaped handsome benefits by having the sewer service furnished to its property while the plaintiff's property, equal to the Authority's property in topographical features, lay idle without sewer service. The citizens of the Town benefitted generally because public revenues were not expended in providing the sewer service to the plaintiff's property. The costs, on the other hand, were borne solely by the

---

24. *See generally* Richard A. Epstein, *A Symposium on Property Rights: Property as a Fundamental Civil Right*, 29 Cal.W.L.Rev. 187, 194 ("The classical conception of property thus gives to its owner three attributes, exclusive possession, exclusive use and full rights of alienation by sale, gift, will and the like.").

25. Of course, the economic cost to the plaintiff may be much higher. When the plaintiff chose to invest in the property by preparing the property for industrial development, the plaintiff necessarily made the choice to forgo other investment

opportunities. Thus, in economic terms, the plaintiff's "opportunity cost" in investing in the development of industrial property is defined as the value of the next best alternative of its investment. Using a conservative estimate of a five-percent rate of return, a $407,000 investment made in 1974 would have yielded a return of approximately $365,000 over an eleven-year period. Thus, under an economic analysis, the plaintiff would be unable to recoup or to better its investment.

plaintiff. The court concludes that the Town has not acted responsibly to achieve any alleged public purpose because the Town has specifically allocated to the plaintiff a burden which should be shared by all. Thus, where there is such a complete absence of reciprocity of advantage resulting from governmental action, then the compensable force of the Takings Clause must be felt.

The court believes that alternative uses for the plaintiff's property were neither economically realistic nor realistically available. In *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169 (Fed.Cir.), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), the court rejected the Government's argument that the claimant retained some economic value in its property for use as farm land where the claimant's distinct investment-backed expectation was to use the property to mine coal. In the instant case, the plaintiff's property and the property located across the state route were zoned for industrial use. It appears unlikely to this court that alternative uses were economically realistic given the character of the surrounding properties. For example, a residential subdivision surrounded by industrial operations would seem not to be an economically realistic alternative use for the plaintiff's property, especially considering the lack of sanitary sewer lines. The court cannot conclude that realistic economic alternatives existed to permit the plaintiff to recoup its investment and to realize its distinct investment-backed expectations where the property was not suited for its highest and best available use due to the defendants' refusal to provide the mandated sewer service.

Accordingly, the court affirms its judgment that the defendants deprived the plaintiff of all economically viable use of its property by failing to furnish sewer service to the property as directed by the order of an annexation court and that, thereby, the defendants effected a regulatory taking of the plaintiff's property without just compensation, in violation of the Fifth Amendment to the federal constitution.

### B. Substantive Due Process

In its amended complaint, the plaintiff sought relief pursuant to § 1983 on a claim of a denial of substantive due process.[26] Although recovery is difficult pursuant to a claim of a violation of substantive due process in the social and economic legislative arena, *see, e.g., United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 784, n.4, 82 L.Ed. 1234 (1938), the court believes that the circumstances of this case bring it squarely within the "claim of entitlement" standard recognized by the Su-

26. As an initial matter, the plaintiff is required to pursue inverse condemnation proceedings at the local and state level before pursuing a § 1983 action based upon a substantive due process claim in federal court, notwithstanding considerable case law suggesting otherwise. In *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), the Supreme Court noted that "[t]he federal remedy [under section 1983] is supplementary to the state remedy and the latter need not be first sought and refused before the federal one is invoked." *See also Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). However, depending upon the character of the deprivation of property, there is a split among, and even within, the federal circuits as to whether to permit section 1983 actions based upon substantive due process claims to proceed in federal courts without prior state adjudication on the just compensation question. *Compare Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398 (9th Cir.1989) (finding that there was no requirement that a property owner exhaust state remedies where there was a *physical* deprivation of property interests), *cert. denied sub nom. Doody v. Sinaloa*

*Lake Owner's Ass'n,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *Bateson v. Geisse,* 857 F.2d 1300 (9th Cir.1988), *with Culebras Enters. Corp. v. Rivera Rios,* 813 F.2d 506, 516 (1st Cir.1987) (holding that "there can be no violation of substantive due process ... at least until the state inverse condemnation proceeding is resolved"); *Shelter Creek Dev. Corp. v. City of Oxnard,* 838 F.2d 375, 379 (9th Cir.) (noting that substantive due process claims based upon regulatory deprivations should be analyzed for ripeness in the same manner as regulatory taking claims are analyzed), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988). This court concludes therefore that the plaintiff was required to pursue inverse condemnation proceedings at the state level before proceeding to federal court with its § 1983 action based upon a claim of substantive due process. Furthermore, consistent with the court's conclusions in Part II, *supra,* the court finds that the plaintiff has sufficiently pursued inverse condemnation proceedings at the state level, and, therefore, the plaintiff's § 1983 action based upon a claim of a denial of substantive due process is ripe for adjudication in this federal court.

preme Court in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and adapted to substantive due process claims in *Gardner v. Baltimore Mayor & City Council,* 969 F.2d 63 (4th Cir.1992).[27]

In *Roth,* the Supreme Court recognized that certain attributes of "property" are protected by procedural due process. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. The Court stated that for a person to have a property interest in a benefit, the person "must have more than a unilateral expectation" of the benefit; rather, the person "must have a legitimate claim of entitlement to it." *Id.* According to the *Roth* Court, "property interests.... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."[28]

Several circuits have adapted the *Roth* "claim of entitlement" standard for claims of procedural due process to apply for claims of substantive due process. *See Gardner,* 969 F.2d at 68–69; *Spence v. Zimmerman,* 873 F.2d 256, 258 (11th Cir.1989); *RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989); *Carolan v. City of Kansas City, Mo.,* 813 F.2d 178, 181 (8th Cir.1987). In *Gardner,* the Fourth Circuit articulated the "claim of entitlement" standard in cases arising pursuant to a claim of substantive due process as follows: "whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency

lacks *all* discretion to deny the issuance of the permit or to withhold its approval." *Gardner,* 969 F.2d at 68 (emphasis in original). The court cautioned that "[a ]*ny significant discretion* conferred upon the local agency defeats the claim of a property interest." *Id.* (emphasis added). In fact, the standard "focuses on the amount of discretion accorded the issuing agency by law, not on whether or to what degree that discretion is actually exercised." *Id.* Accordingly, a cognizable property interest emerges " 'only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured.' " *Id.* (quoting *RRI Realty,* 870 F.2d at 918). If the plaintiff establishes a cognizable property interest, then the court must address "the question of whether a purported deprivation was arbitrary or capricious." *Id.*

The court concludes that the plaintiff possessed a cognizable property interest in the provision of sewer service as of January 1, 1986. In the seven-year period following the effective date of annexation, it is clear that the defendants possessed considerable discretion in providing sewer services to the plaintiff's property. Thus, the plaintiff possessed, at most, a contingent property interest in sewerage to its property within that seven-year period. However, the seven-year period expired on December 31, 1985, and, thereafter, the plaintiff possessed a *vested* property interest in the provision of sewerage to its property. Pursuant to the clear language of the Order of the 1978 Annexation Court, the defendants were required to provide sewer service to the plaintiff's property. Furthermore, as discussed above, the

---

**27.** Indeed, the facts of this case may render a substantive due process claim uniquely proper. At least one commentator has observed that

the fourteenth amendment's Due Process Clause more than adequately can protect a landowner who finds his investment-backed expectations or entitlement to property frustrated, but not finally taken under the fifth amendment in the *process* of government decisionmaking. If governmental action implementing or executing official land use policies is arbitrary or capricious, if the procedures used by government in processing land use development applications are unfair, if a landowner finds himself on an administrative

treadmill which unreasonably delays [the] processing of his application, if government otherwise bases its land use decisionmaking on standardless whim, or, even if the substance of the land use regulation itself is unreasonable, the fourteenth amendment's Due Process Clause should provide protection.

Carlisle, *supra* note 18, at 597 (emphasis in original).

**28.** In *Roth,* the Court concluded that the respondent had failed to demonstrate that he had a "property interest" in re-employment sufficient to require the petitioner to accord him procedural due process. *Id.* at 577–78, 92 S.Ct. at 2709–10.

Virginia statutory scheme regulating annexation does not authorize the local or state governmental officials to determine the necessity of capital improvements; rather, that authority is clearly vested in the annexation court. *See* Va.Code Ann. § 15.1–1042. Also, the Town represented to the reconvened annexation court that the plaintiff need only to apply for sewer service and the Town would provide such service. The Town clearly indicated to the reconvened annexation court that the application process was merely *pro forma* and that the plaintiff would be entitled to receive sewer service upon the filing of an application. To be sure, the Town was without authority to deny the plaintiff's application, pursuant to § 15.1–1042. Consequently, it is clear to this court that the defendants were not possessed of any significant discretion because the discretion of the defendants was so narrowly circumscribed that approval of the plaintiff's proper application was virtually assured. Accordingly, the court concludes that the plaintiff possesses a cognizable property interest in the provision of sewer services to the plaintiff's property.

Having determined that the plaintiff is possessed of a cognizable property interest, the court is readily able to conclude that the defendants acted with manifest arbitrariness and capriciousness in depriving the plaintiff of that cognizable property interest. *See, e.g., Altaire Builders, Inc. v. Village of Horseheads,* 551 F.Supp. 1066, 1069 (W.D.N.Y. 1982) ("Regardless of the deference normally accorded zoning practices by the courts, the Constitution does not tolerate arbitrary and unreasoned action.") (citation omitted). In *Cordeco Dev. Corp. v. Vasquez,* 539 F.2d 256 (1st Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976), the court held "that local officials had committed a constitutional violation by singling out a permit applicant for adverse treatment due to 'illegitimate "political" or, at least personal motives.' Such 'purposeful discrimination' against a particular individual was held to violate the Constitution even where no recognized class-based or invidious discrimination was involved." *Scott v. Greenville County,* 716 F.2d 1409, 1420 (4th Cir.1983) (citing *Cordeco,* 539 F.2d at 260).[29] " 'The regular and impartial administration of public rules governing [liberty and property] interests, as required by due process, prohibits the subtle distortions or prejudice and bias' even where no class-based or other generalized invidious discrimination motivates the adverse treatment of a particular applicant." *Id.* (quoting *Wilkerson v. Johnson,* 699 F.2d 325 (6th Cir.1983)). In *Scott,* the court found that a property owner was deprived of due process where a moratorium on construction was limited to an area in which the property owner proposed to build and where the property owner's application for a building permit was the sole pending application from that area. *Id.* In the instant case, the court has little trouble concluding that the defendants acted arbitrarily, capriciously and in an unreasonable manner. The Order of the 1978 Annexation Court explicitly directed the defendants to provide sewer service to the plaintiff's property by a specified date. As this court has often repeated, the directive of the annexation court left the defendants with no discretion which to abuse. This case is analogous to *Scott* in which a county's council was barred from involvement in the issuance of particular permits and therefore had no legal basis for issuing the moratorium on building permits. In the instant case, the defendants are barred from exercising any discretion in determining whether to provide sewer service to land annexed where the determination of the necessity of providing sewer service is statutorily-vested in a state annexation court, and, consequently, the defendants had no legal basis for refusing to provide the sewer service. When the defendants acted contrary to and in direct violation of the mandate of the annexation court, then it is undeniable that the defendants acted arbitrarily and with caprice. Accordingly, the court will hold that the defendants' conduct violated the plaintiff's right to due process, in violation of the Fourteenth Amendment.

**29.** In a footnote, the *Scott* court noted that "[a]lthough *Cordeco* speaks technically of a denial of equal protection by 'purposeful discrimination,' it fits more broadly into a line of cases addressing the substantive unfairness of the process by which governmental actors deprive a citizen of a protected interest." *Id.* at 1420 n. 14 (citations omitted).

## C. Equal Protection

■ In *Front Royal III*, this court granted the plaintiff's motion for summary judgment on the basis of a violation of the plaintiff's right to equal protection under the laws. *Front Royal III,* 708 F.Supp. at 1487. Noting that the "mere rationality" scope of judicial review applied in the case, this court acknowledged that in order for the plaintiff to prevail on an equal protection claim, the plaintiff would have to demonstrate that there was no rational relationship between a legitimate state interest and the defendants' decision not to provide sewer lines to the plaintiff's property. *Id.* at 1485. In this court's view, the dispositive factor was the defendants' inability to point to any legitimate state interest that was possibly furthered by the defendants' failure or refusal to comply with the strict mandate of the annexation court. Inasmuch as the defendants could not demonstrate a permissible or legitimate state interest, this court's inquiry ended.[30] Consequently, the court concluded that "[r]eading [the] testimony in the light most favorable to defendants, as this court must do in passing on plaintiff['s] motion for summary judgment, [this court finds] that the purposes articulated by the defendant for their refusal to extend sewer service cannot count as legitimate state interests, given the legal mandate imposed on the town by the annexation orders." *Id.* at 1486. This court reinstates its decision in *Front Royal III* on the issue of a violation of equal protection.

## VI. Damages

The plaintiff has requested that the court modify its award of damages and attorneys' fees. In *Front Royal IV*, the court awarded the plaintiff compensatory damages of $489,072.49. Because of changes in the factual circumstances of the case—namely, that the defendants have now provided sewer service to all sixteen of the plaintiff's lots—the court will modify its award of damages.

In *Front Royal IV,* the court calculated damages in reliance upon the cases of *Nemmers v. City of Dubuque,* 764 F.2d 502 (8th Cir.1985), and *Wheeler v. City of Pleasant Grove,* 833 F.2d 267 (11th Cir.1987) (*"Wheeler II"*). In *Wheeler II,* the court held that "the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction." *Wheeler II,* 833 F.2d at 271; *see also Wheeler v. City of Pleasant Grove,* 896 F.2d 1347 (11th Cir. 1990) (*"Wheeler IV"*). Applying this rationale to the facts of the instant case, this court concluded that an award of damages should be based upon the difference between the fair market value of the land with sewer service and the fair market value of the land without such service. Based upon the evidence in the case, this court concluded that "the fair market value of that property [in 1985] was $405,000 without sewer and $810,000 with sewer, leaving a difference of $405,000." *Front Royal IV,* 749 F.Supp. at 1448. *See* 4 Nichols, *supra* note 23, § 12E.01 at 12E–2 to 12E–3 ("[F]air market value is calculated as the difference between the fair market value of the property immediately before the taking, and the fair market value of the property after the taking."). The court then reduced the $405,000 difference by three-sixteenths to account for the fact that the Town had provided sewer service to three of the plaintiff's sixteen lots in the parcel. *Front Royal IV,* 749 F.Supp. at 1448. After applying the appropriate interest rate, this court calculated the plaintiff's compensatory damages to be $489,072.49. The court will revisit its determination on the award of damages.

■ The damages award turns on the fair market value of the property. In determining fair market value, the property owner "is entitled to have consideration given to all of the capabilities of the property, to the business or use, if any, to which it has been devoted, and to any and every use to which it may reasonably be adapted." 4 Nichols, *supra* note 23, § 12.02[3] at 12–87. Thus, the

---

**30.** While the defendants' failure to identify a legitimate state interests essentially ended the inquiry, this court continued to examine whether there existed either an actual or a conceivable basis for a rational relationship between any arguable legitimate state interest and the defendants' actions in this case. This court could not ascertain any such rational relationship.

"most advantageous use to which the property may be adapted, where such use has an effect upon the market value, may be considered." *Id.* § 12.02[3] at 12–88. However, "[t]he productive value of land, or value of the land to its owner based on the income he is able to derive from his use of it, is not the measure of compensation and is not material except so far as it throws light upon the market value." *Id.* § 12.02[2] at 12–82 to 12–83.

In *Front Royal IV,* this court used a comparable sales approach to determine the value of the plaintiff's property at the time of the taking or the deprivation of the property interest. "The comparable sale approach—analyzing sales of similar commercial property in order to arrive at a fair market value—is generally accepted as providing the best evidence of fair market value." *Front Royal IV,* 749 F.Supp. at 1448 (citing *United States v. 179.26 Acres of Land,* 644 F.2d 367, 371 (10th Cir.1981); *Houser v. United States,* 12 Cl.Ct. 454, 472–73 (1987)). Indeed, this court believes that the comparable sales approach is most consistent with the principles outlined above regarding the determination of fair market value. Thus, the court will adopt its conclusions in *Front Royal IV* regarding the fair market value of the property.

However, the inquiry does not end here. In *Front Royal IV,* the court determined the plaintiff's damages based upon the fact that the defendants were effecting an ongoing takings. Under the circumstances as they now exist, the taking ended on November 29, 1995, when the Town provided sewer service to all of the plaintiff's sixteen lots. Thus, applying the standard set forth in *Nemmers* and *Wheeler II,* the court will award damages to the plaintiff equal to the return on the difference between the 1985 fair market value of thirteen of the plaintiff's sixteen lots with sewer service and the 1985 fair market value of those lots without sewer service, for the period from January 1, 1986 to November 29, 1995. Applying the average three-year treasury rate for this period, the court

shall affix the plaintiff's compensatory damages at $359,441.47.[31] For the reasons stated in *Front Royal IV,* the court will grant the plaintiff a modified award of attorneys' fees and, therefore, based upon the affidavit of the plaintiff's counsel, shall affix the award of attorneys' fees at $105,317.90.

### VII. Conclusion

The court will reinstate its prior judgments in *Front Royal III* and *Front Royal IV,* as modified by the court's conclusions contained in this opinion. Accordingly, the court grants the plaintiff judgment on the § 1983 action based upon claims of regulatory taking, a denial of substantive due process, and a denial of equal protection under the laws. An appropriate Order shall this day issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

1. The plaintiff's motion to reinstate the prior judgment of this court shall be, and it hereby is, *GRANTED.* The prior judgment shall be, and it hereby is, amended by the court's findings and conclusions in the accompanying Memorandum Opinion.

2. The court grants the plaintiff judgment on its action pursuant to Title 42, United States Code, Section 1983 based upon the claim of a so-called takings in violation of the Fifth Amendment to the Constitution of the United States; the claim of a violation of due process in violation of the Fourteenth Amendment; and a claim of a denial of equal protection under the laws in violation of the Fourteenth Amendment.

3. The court shall, and hereby does, affix the plaintiff's compensatory damages at $359,441.47.

---

**31.** In *Front Royal IV,* this court overruled the plaintiff's motion for punitive damages. The court determined that the evidence did not demonstrate the level of reckless or callous disregard required to justify this court imposing punitive damages against the defendants. *See Front Royal IV,* 749 F.Supp. at 1439. The court affirms that prior decision.

4. The court shall, and hereby does, affix the award of attorneys' fees and costs in favor of the plaintiff in the amount of $105,-317.19.

5. The defendants' motion for final judgment shall be, and it hereby is, *OVERRULED*.

The Clerk of the Court is hereby directed to strike the case, Civil Action Numbered 87–00019–H, from the active docket of this court.